*Spring Term*
*1839.*
*Kennedy's Heirs*
*vs*
*Covington.*

---

CHANCERY. Kennedy's Heirs *against* The Trustees of Covington and Others.

[Mr. M. C. Johnson, Mr. Chase (of Cincinnati) and Mr. Gaines for appellants: Mr. Owsley and Mr. Robinson for appellees.]

FROM THE CIRCUIT COURT FOR SCOTT COUNTY.

*April 23.*

The opinion in this case was delivered by *Chief Justice Robertson*, on the 19th of December last; but was then suspended, at the instance of counsel, and remained suspended until this day; when, some modification having been made in the mandate, the opinion and mandate were made final, as follows:

The events and facts which gave rise to, and have an influence upon, this controversy.

On the 8th of February, 1815, the town of Covington was established on a hundred and fifty acres of land, on the rivers Ohio and Licking, below their confluence, by an act of the Kentucky Legislature, reciting that Thomas D. Carneal, Richard M. Gano and John S. Gano, the proprietors of the town, and on whose application the act was passed, had bought the land from Thomas Kennedy, and vesting the title in five persons as trustees, with power to sell the *lots, as previously laid off,* and to convey the titles, upon the orders and for the benefit of the proprietors.

On the plat of the town, as recorded in August, 1815, there is an endorsement signed by the proprietors and three of the trustees, in these words:—"Such part of "the town as lies between the lots and the edge of the "bank of the Ohio river, as will appear by a reference "to the said plat, shall remain for the use and benefit of "said town, for a common. The proprietors reserve to "themselves, their heirs and assigns forever, all ferry "right, and every advantage and privilege thereto, which "they have not disposed of, or which by law they would "be entitled to."

On the 2nd of March, 1815, Thomas Kennedy, who owned the hundred and fifty acres bounded by the Licking and Ohio rivers, and on which Covington was established, conveyed to Carneal and R. M. and J. S. Gano, his title thereto, for the consideration of fifty thousand dollars, and, at the same time, took a mortgage on some of the lots as designated on the plat, and also on the ferry privileges, as a collateral security for thirty four thousand dollars of the price which had not been then paid.

At the first sale of lots, on the 20th of March, 1815, the reservation to the proprietors of all ferry rights, was published, and every title bond and deed since given or made for a lot in Covington, recited the same reservation.

Afterwards, R. M. Gano conveyed his interest in the town to Bakewell, Page and Bakewell, of Pittsburgh; and subsequently, both R. M. Gano and J. S. Gano having died, Carneal conveyed his interest to the heirs of the latter.

Thomas Kennedy, having obtained, in 1822, the grant of a ferry across the Ohio river, also died, and by his last will, bequeathed to his son, Samuel Kennedy, and to a daughter, the debt still due to him from the proprietors of the town.

In June, 1824, pursuant to an order from Bakewell, Page and Bakewell, three of the then trustees of Covington, two of whom had been original trustees, conveyed to the heirs of J. S. Gano, their title to all the ground included within the town limits, between the

edge of the bank and low water of the Ohio river; and, in 1827, those heirs conveyed their interest in the same ground to Samuel Kennedy, in payment of fifteen thousand dollars of the original consideration.

In March, 1828, the County Court of Campbell, granted to the trustees of Covington, a ferry across the Ohio, from the town of Covington to that of Cincinnati. Samuel Kennedy, being in Court, moved for a continuance, on the ground that his principal counsel was necessarily and unexpectedly absent; but his motion was overruled, and though he seems not to have had time to arrange and exhibit his documents of title to the land between the edge of the bank and the Ohio river, he opposed the grant of ferry privileges to the trustees; and having excepted to all the orders of the Court, appealed to this Court, which dismissed his appeal, because, in the opinion of a majority of the Judges thereof, he had no right to introduce extraneous proof of title, and thus rely on any error in fact not apparent on the record; which did not exhibit evidence of his title, but recited the fact that the County Court had heard satisfactory proof of title in the trustees.

Object of the present bill; its dismissal by the court below, and appeal.

To enjoin the use of the ferry thus granted to the trustees, and to obtain a decree for setting aside the grant, or declaring it void, or for such other relief as he might be entitled to in equity, Samuel Kennedy filed this bill in chancery against the trustees of Covington and others who claimed and used the ferry under them.

But the Circuit Court, upon final hearing, on an unusually voluminous record, dismissed the bill absolutely. And that decree is now brought up for our revision.

The grounds relied on by the appellants, to reverse the decree, & establish their legal right to all the ferry privileges within the town of Covington, or their equitable right to the use and profits derived from them.

The counsel for the heirs of Samuel Kennedy—now deceased, who are the appellants, insist that the decree should be reversed on one of the three following grounds: *First*—because, he being, as they argue that he was, the owner of the landing of the ferry granted to the trustees, and the County Court having legal authority to grant the ferry *only* to the owner of the land on the river, the grant to the trustees was void; and therefore, the Circuit Court should have enjoined any disturbance of his (now the appellants') ferry right, by

the use of the ferry thus illegally granted to the trustees.

*Secondly*—because the grant of the ferry to the trustees, was obtained surreptitiously, without allowing any opportunity to make preparation for defeating or reversing it; and was, moreover, procured by the casting votes of two magistrates who were personally interested in it, and were, therefore, objected to as Judges in the case; and that therefore, as there was, according to the opinion of a majority of the Judges of this Court, no available remedy by appeal or writ of error, a court of equity should decree a new trial.

*Thirdly*—because, if Samuel Kennedy did not own the exclusive legal title to the landing, he had the entire and only beneficial right, and was entitled in equity. to all ferry privileges and benefits incident thereto; and therefore, he had a right to demand of a court of equity, an enforcement of the alleged trust, and a decree also for damages, or for profits received by the trustees, who, as argued, held the ferry in trust for his use and benefit.

These propositions will be briefly considered in their numerical order.

*First.* Although the County Court had no authority to grant a ferry to the trustees unless they held the title to the landing—nevertheless, as it had jurisdiction to grant ferries across the Ohio river, and to decide as to the title of every applicant for such a franchise, and as to that also of any party who might be prejudiced by a grant to another; and as the record of the grant to the trustees recites the fact that the trustees proved title to the landing, it exhibits a case *prima facie* within the special cognizance of the County Court; and therefore, the order granting the ferry was apparently valid, and should not be deemed void, but erroneous merely, in consequence of the extraneous fact that, in another case, this Court should, upon other and fuller evidence, be of the opinion that the title was not in the trustees, but was in the opposing party. Had Kennedy not been grant, by appealing to an appropriate forum, and showing his own better title to the land, and consequent right to the franchise.

Spring Term 1839.

Kennedy's Heirs
vs
Covington.

A ferry can be legally granted only to the owner of the soil at the landing. But, as the County Cts. in granting ferries, decide upon the titles of applicants, and opponents,—when the record of a grant recites, that the grantee proved his title to the landing, the grant is not void—tho' erroneous — because another was in fact the true owner, and the order (unreversed) is conclusive on all who were parties to it. But one who was no party may resist the

Spring Term
1839.

*Kennedy's Heirs*
vs
*Covington.*

a party in the County Court, he would not have been concluded by the order, and might, therefore, have prevented the enforcement of it, to his prejudice, by showing in an appropriate *forum* that he, and not the trustees, owned the land, and therefore had the only right to all ferry franchises incident thereto. But having been a party in the County Court, he had no right to controvert the title of the trustees by any original suit.

*The granting of a ferry by a county court, is a judicial act—subject to revision in the court of appeals.*

It is now too late to deny that in granting ferries, the County Courts act judicially, and that a palpable and pernicious error in establishing or refusing to establish a ferry, may be reversed by this Court.

*For an error of a county court—in refusing to continue a ferry case, or allow time to produce a title—the remedy is by appeal, or w. e. only.*

*Second.* The refusal by the County Court to grant to Kennedy a continuance, or more time for presenting his title fairly, seems to have been harsh and unreasonable; and was perhaps erroneous. But, for mere error, the action of the County Court was revisable by this Court only; and if this Court had no jurisdiction to hear Kennedy, and afford him redress, there was no revisory remedy in any *forum.*

*A ferry was established by a County Court, when two of the justices by whose votes the order was made, were inhabitants of the town to which the ferry was granted: held that this fact—the interest of those justices being but slight, remote and contingent—is not sufficient to authorize a court of eq. to set aside the grant, or compel the grantee to submit to a new trial of the application. Tho' the grant might be set aside, in equity, upon a bill impeaching it for fraud, if the fraud could be established—which is not done in this case.*

Nor should a Court of Equity either enjoin the order of the County Court, or decree a re-hearing, on the ground merely, that two of the justices, by whose votes the order was made, decided in favor of their own interest, and refused to leave the decision to those to whom no selfish motive was imputed.

The conduct of those two justices may have been as indelicate and reprehensible as it was certainly unusual. But their interest, if they had any, appears to have been slight, contingent and remote—arising as it did, chiefly, if not altogether, from the fact that they were citizens of Covington; and the order made by the Court was not, therefore, void, so as to authorize a bill in chancery to enjoin the trustees of Covington from disturbing Kennedy's ferry franchise by using the privilege claimed by themselves without authority of law.

But if the conduct of the County Court, when considered altogether, afford satisfactory evidence that the grant to the Trustees of Covington was fraudulent, we should not doubt the jurisdiction of a court of equity

to set it aside, on an original bill impeaching it for fraud. We do not feel authorized, however, to infer that the conduct or decision of the County Court, or the conduct of the trustees was, in fact or in judgment of law, *fraudulent*.

Spring Term
1839.
Kennedy's Heirs
vs
Covington.

We are therefore of the opinion that, according to the facts, as now exhibited in this Court, we cannot either set aside the order of the County Court, or enjoin it for the purpose of producing a re-hearing in that court.

The two points we have thus disposed of, were urged by Kennedy's counsel, on the assumption that the legal title to the landing on the Kentucky shore was in him, and not in the trustees. And, if this assumption be sustained by the facts now presented by the record, his bill was properly dismissed; because there is, in our opinion, no sufficient proof of fraud in obtaining the grant by the trustees, and, as already decided, Kennedy's heirs would have no right to the interposition of a court of equity, on the plea, either that the grant ought not to have been made to the trustees, or that, as made, it was *void*, for want of a legal title in them to the land on the river.

*Third.* But if the trustees should be deemed to hold the legal title to the land on the river, and if, also, Kennedy be entitled to the equitable interest therein, or to the benefit of all ferry franchises incident to the title thereto, then the grant of the ferry to them, might be considered as inuring, in equity, to his use, and a court of equity might, under the general prayer in his bill, enforce such resulting trust, and secure to his heirs the net profits of the ferry.

The legal title to the land upon which a ferry on the Ohio, and in a town, was established, being in the trustees of the town, while the equitable right to the benefit of the ferry franchise belongs to an individual, the grant inures to his benefit, & his rights in that respect, may be enforced in a court of equity.

Upon this last and most difficult point, we must therefore determine, (1.) whether, when the ferry was granted to them, the Trustees of Covington held the legal title to the Kentucky landing; and (2.) whether Kennedy then had, and his heirs still have, the equitable right to it, or to all ferry privileges attached by law to the legal title, held by the trustees.

*First.* We have no doubt that Covington, as established by the legislative act of February, 1815, extends

The town of Covington, as established by a legis-

Spring Term
1839.

Kennedy's Heirs
vs
Covington.

lative act in 1815, extends to the Ohio river. The legal title of the land appropriated for the town, was then in Th. Kennedy. But the act, according to a former case (4 Litt. 322,) vested it in the trustees—bond & security having been given to indemnify any person who might show a better title. But whether the doctrine of that case should be applied to this, is not decided. For—

As the act recites that the proprietors, at whose instance it passed, had purchased the land of Th. Kennedy, and as he, no doubt, knew of and assented to the act, which he confirmed by a conveyance, soon after, of the legal title to the proprietors therein named—the presumption is, that he had sold the land to them, by executory agreement, before the passage of the act—especially, as the land had been laid out in streets and lots, before the act passed; and it is therefore *held*, that the act is conclusive evidence that the legal title was vested in the trustees appointed by it. And presumed also, that a mortgage made by the

to the Ohio river, as its northern line of prescribed limits. Nor have we any doubt that, at the date of that act, Thomas Kennedy held the exclusive legal title to all the land embraced within the boundary of the town as established. Nevertheless—according to the principles applied by a majority of this Court, in the case of *Jackson et al.* vs. *Winn's heirs et al.* 4 *Litt. Reps.*—the legislative act had the effect of vesting the paramount legal title in the trustees designated by the act—bond and approved security having been given for the indemnity of any person who should establish a better right than that of the proprietors of the town.

But whether the doctrine ruled in that case should be applied to this, we shall not pause to determine; because, however that question might be decided, the original trustees should be considered as holding the legal title. We should, as we think, presume that Kennedy had, prior to the date of the legislative enactment, sold the land to Carneal and the Ganoes, by an executory agreement which his subsequent conveyance only consummated, and also, that knowing that they bought it for the purpose of establishing a town upon it, he assented to the act for establishing Covington, and confirmed that assent by his deed executed on the 2d of March, 1815. Though the act recites that it was passed at the instance of *Carneal* and the *Ganoes*, it also recites that they had *bought* the land from Thomas Kennedy. It is incredible that they would have procured the passage of such an act, had they not previously bought the land. Nor is it probable that Kennedy was ignorant of their application to the Legislature, or of the passage of the act establishing the town on land claimed by them, and described in the act as theirs under a sale from himself; and the more especially, as the act also recites—what, otherwise, would be intrinsically probable—that the land had been previously laid off into lots, streets &c. And when he conveyed the title, he must be presumed to have known all those facts; and therefore, his conveyance should be deemed a recognition of them, and a confirmation of his previous assent, express or implied, to the passage of the act establishing the town.

We therefore feel authorized to conclude that Kennedy had sold the land to Carneal and Co. prior to the passage of the act establishing Covington thereon; that they bought the one hundred and fifty acres, at the price of fifty thousand dollars for the purpose of establishing such a town upon it, and that he knew that fact, and assented to the establishment of the town, as it was established. And upon this deduction, there can be no doubt that, as between the present parties, the legislative act itself is conclusive evidence that the legal title to the one hundred and fifty acres of land was vested in the trustees appointed by the act—Kennedy being estopped by his presumed assent, and the proprietors by the establishment of the town *as on their land.*

We may presume also that, by the executory contract of sale, Kennedy reserved a lien on the land for securing the purchase money; and that therefore, when he conveyed to Carneal and Co. the mortgage given to him by them, was only what they had agreed that he should have; that is, a lien on a portion of their beneficial interest as the proprietors of the town.

But, had not the legal title passed to the trustees by the legislative act, we would, nevertheless, be of the opinion that it would have been vested in them, by operation of law, the instant it had been conveyed to Carneal & Co., or as soon, at least, as the lots had been sold to *bona fide* purchasers, under the law establishing the town upon the application and for the benefit of Carneal and Co.

The mortgage given to Kennedy could not have effected the legal right of the trustees, because it embraced only the ferry privileges incident, by law, to the legal title to the land on the river, and did not purport to convey any legal interest in that portion of the land itself. It has been often decided by this Court, that ferry franchises are statutory incidents to the proprietorship of land on *the Ohio river;* and we have also decided that the beneficial or equitable right to the profits of such a franchise on that river, may be separated, by contract, from the legal ownership of the soil. The mortgage to Kennedy—not purporting to pass any title to the strip

viii. 8

Spring Term 1839.

Kennedy's Heirs
vs
Covington.

purchasers to the vendor (Kennedy,) at the time when he conveyed the legal title, was but the continuance of a lien reserved by the executory contract of sale.

*Held* also, that the conveyance of the legal title, after the passage of the act, to those at whose instance it passed, and whom it recognizes as proprietors of the town, would have vested the legal title instantly, by operation of law, in the trustees, or at least, in those to whom they conveyed the lots.

Ferry franchises on the Ohio, are statutory incidents to the proprietorship of the land; but the beneficial right to the profits may be separated by contract from the legal title to the soil, and may be the subject of an equitable mortgage which does not include or affect the legal title to the land. *Vide post,* p. 59

Spring Term
1839.

Kennedy's Heirs
vs
Covington.

of land next to the river—operated, therefore, only as an equitable lien on all the beneficial interests in the ferry rights to which the mortgagors were entitled; and the legal title to that piece of land still remained where it was and would have been independently of the mortgage.

We are, therefore, clearly of the opinion that the original trustees acquired the exclusive legal title to all the land included within the chartered limits of Covington.

And we are of the opinion, also, that the legal right, thus once vested in the trustees, never passed to Kennedy.

The interests of the proprietors having been beneficial only, their conveyances thereof transferred to Kennedy no more than an equitable title. Nor did the subsequent conveyance by the trustees, who were successors of those appointed by the act of 1815, vest in him a legal title.

The act establishing the town of Covington, and defining the powers and duties of the trustees, authorized them to convey *the lots*; but, as the strip of land between the river & nearest parallel st., was never designed for lots, but reserved for other uses, the trustees had no power to convey it, tho' the legal title was vested in them.

According to the doctrine recognized in the case of *The Trustees of Falmouth* vs. *Horter*, (4 *Littell*, 119,) the title vested in the original trustees, did not pass to their successors by operation of law, because the act establishing Covington contained no words of succession. A majority of the original trustees never attempted to convey the legal title to the ground between the *common* and the *Ohio*.

And if, nevertheless, an act of Assembly of 1801, (*Statute Law*, 1510,) should be so construed as to authorize the successors of original trustees of towns to sell and convey a legal title which had never passed to them, still we are of the opinion, that the trustees who made the conveyance to Kennedy, had no power to sell and convey the legal title, either to the common, or to the ground between that and the river: first—because the act establishing the town and defining the duties and powers of the trustees, gives them authority to sell and convey only the town lots, as designated on the plat of the town; and the plat shows indisputably, that the belt of ground between the Ohio and the parallel street nearest thereto, was not designed for town lots, but was reserved for some other use; and, secondly—be-

cause, although the proprietors may have been entitled to a certain beneficial interest in so much of the ground as lies between the common and the river, yet as the exclusive use of it, or dominion over it, as private property, would be inconsistent with the ends for which it was set apart by the plat and the act of 1815, we must presume that the legal title to it was deposited with the trustees, not for alienation, but only for the purpose of holding it, and thereby effectuating the trusts for which it was dedicated, as obviously and inviolably, as the streets, alleys and common.

It is not material whether the legal title to the ground on the river was in the original trustees or their successors when the ferry franchise was granted to the latter; because, if it were in the former, the latter, having nevertheless the legal right to execute and secure all the trusts to which it was subject, had an undoubted authority to obtain the grant of a ferry as an incident to their legal right to control and effectuate all those trusts; and moreover, they are estopped by their own acts, to deny that they have a legal title to the ground, and hold the ferry subject to all the trusts to which it would have been subservient had the legal title to the ground on the river been vested in them.

As the ferry granted to the trustees is held in trust, the important question now arises—*for whose benefit is it so held?*

In the case of *Lytle et al.* vs. *Breckenridge*, (3 *J. J. Marsh.* 663,) this Court decided that, though a ferry franchise is a statutory incident to the legal title to land on the *Ohio* river, and though, therefore, the owner of that title should be the grantee of the ferry, yet the beneficial interest in such a ferry, being vendible and

<div style="float:right">
Spring Term 1839.

*Kennedy's Heirs* vs *Covington.*

A ferry having been granted to the trustees of a town, it is immaterial whether the title to the landing was in them, or in their predecessors. As trustees, they had a right to obtain the grant—subject to all trusts. And, they are estopped, by their acts, to deny that they had the title, and hold the ferry as the owner of the soil would have held it.

Tho' a ferry franchise, being a statutory incident to land, should be granted only to the owner of the landing—the *beneficial* interest may be transferred to, and held by, another; who may enforce the trust which entitles him to the profits. And—
</div>

The town of Covington was laid out in streets and lots, with a strip between them and the Ohio, reserved for public uses, and the whole represented on a plat, upon which was an indorsement, signed by the proprietors and a majority of the trustees, showing that the trustees recognized the right of the proprietors to the entire ferry franchise on the Ohio. And, there being nothing in the act, subsequently passed, establishing the town, inconsistent with such a reservation—it is presumed, that the indorsement was but a recognition of a previously reserved right; and this presumption being fortified by other considerations, it is *held*, that the proprietors were entitled, in equity, to the full benefit of the franchise; and that they were, and that those claiming under them are, entitled to all the benefit and profits of the franchise; and to a decree to enforce that right, against the town trustees, to whom a ferry, there had been granted—to which the citizens cannot object, because the Legislature, in establishing the town, knew (it is presumed,) the plan, and purpose of the reservation, and the lots were sold subject thereto.

transferrable in equity, may, nevertheless, belong to an-other and different person, and who may, of course, en-force his equitable right to the profits, on the ground of an available trust.  Consequently, the proprietors of Covington may have been entitled to the beneficial in-terest in all the ferry franchises incident to the land on the Ohio, within the limits of the town, although the legal title to that land was vested in trustees.  And if the proprietors ever had such an interest since the establishment of the town, Samuel Kennedy having, by contract for a valuable consideration, acquired that interest absolutely, his heirs are now equitably entitled to the profits of the ferry granted to the trustees.

The endorsement on the plat of the town, shows that, at the time it was made, the trustees recognized the exclusive right of the proprietors to the benefit of the entire ferry franchise incident to the land within the town limits, next to the *Ohio* river; and there being no-thing in the act of the Legislature inconsistent with such a conclusion, we feel authorized to presume that, in making the endorsement, the trustees only ratified a reservation made and understood at the time when the act was passed for establishing the town.   This presump-tion is fortified by the consideration that, no motive for leaving unappropriated on the plat the narrow belt between the common and the river, can be imagined, unless it was intended to reserve to the proprietors such a residuary interest therein as would, at least, secure to them the full benefit of the ferry which they then own-ed, and the entire ferry franchise attached to that strip of land.

Moreover, as before suggested, we should infer that Thomas Kennedy was, by his executory contract, en-titled to a lien on the ferry privileges, and that the mort-gage afterwards given, was but an execution of that agreement for securing thirty-four thousand dollars of the consideration.

The citizens of Covington cannot object to any such right; because, from the facts already suggested, we presume that the Legislature, when it established the town, knew the plan thereof, and the purpose of leav-

ing the narrow strip of ground unappropriated between the common and the river, and because also, and more especially, the lots were sold subject to the reservation of all ferry privileges by the proprietors.

Why was the common not extended to the river? And why, nevertheless, was the river made one of the boundaries of the town? The reason, as we presume, was this only: that it was deemed important thus to secure to the town a free access to the river, and the certain enjoyment of such *riparian* privileges, and such only, as would leave to the proprietors the beneficial interest in the exclusive ferry franchises, and any other beneficial interest to which they might be entitled, consistently with the public objects intended to be secured by making the Ohio a boundary of the town.

In establishing the town, the Legislature, so far as it considered the public interest, could have felt no concern whether the profits of ferries across the Ohio river from *Covington*, should belong to the people of the town, or to the proprietors at whose instance, on whose land, and for whose benefit chiefly, it was established by legislative authority.

The chief, perhaps the only, public motive for making the Ohio river the northern boundary of the town, was, as we are allowed to presume, not to secure to those who should purchase lots the profits of ferries across that river, but only to afford to them, at all times and under all circumstances, an unobstructed access to it, and an undisturbed right to the common use of its banks. And all these valuable rights and privileges will remain unimpaired and unjeoparded, even though the citizens of the town, as such, should never be entitled to any share of the profits of the ferry franchise. It will equally be the duty of the County Court or the Legislature to establish such ferries, and require such ferry boats, and regulate them in such a manner, as to suit the convenience and promote the interest of the public, whether only one person or many shall be entitled to the net avails of prescribed tolls.

The reservation to the proprietors, recognized by the endorsement on the plat of the town, cannot, therefore,

be considered inconsistent with either the public policy or convenience, or the objects of establishing the town. And consequently, the establishing the town on *the Ohio river* creates no presumption against the right claimed by the proprietors, and acknowledged by the trustees, or against the authority of the trustees to make that acknowledgment.

Even without an express reservation, such a right might have resulted as an implied consequence from the fact that, before the date of the act establishing the town, a ferry had been established, and that the ground immediately on the Ohio, at that point, was not dedicated by the act, to any public use which would, in any manner, require that the ferry franchise should be conceded to the citizens of Covington. The proprietors were not divested, by the act of 1815, of any preexisting privilege or beneficial interest which they could have retained consistently with the public objects of establishing the town on the Ohio, upon the prescribed plan designating streets, alleys and a common for public use, and lots for sale for private use. The proprietors were entitled, of course, to the proceeds of all sales of lots. And it might not be unreasonable to infer that, on the same ground, they were entitled also to the profits arising from the ferry franchise, not given to the town, either expressly or by any implication arising from the provisions of the act establishing the town, or from the presumed or accustomed purposes or uses for which towns on navigable streams are established by law. Besides, the question as to the right to the profits, being one of private interest merely, the purshace of the lots, after explicit notice of the reservation of all ferry privileges by the proprietors, and subject to that reservation thus understood, should be conclusive against any claim by the incorporated citizens of Covington, to a beneficial interest in the profits of the ferry granted to the trustees, merely because they were considered the holders of the legal title to the landing, in trust for the proprietor of the best equity.

Under these circumstances, we have but little difficulty in coming to the conclusion that, as the ferry,

granted to the trustees, is held by them in trust for either Kennedy's heirs, or the city of Covington, it should be deemed to be held for the benefit of the former, and that the citizens of Covington, coming in, especially, as they did, after notice of the reservation by the proprietors, have no equitable claim to the profits of the ferry, for which Kennedy paid a full and apparently high price, to the proprietors of the town as first established.

The only remaining question is whether Kennedy's heirs are entitled to a decree, either for profits hitherto accrued, or for damages for disturbance.

The trustees should not be subjected to damages which Kennedy, or his heirs shall have sustained in consequence of competition between the new and the old ferry: first—because the trustees acted, as we presume, in good faith in obtaining the grant to themselves; and, secondly—because they should not be deemed guilty of any tortious act, in obtaining and keeping in operation a ferry, the establishment of which was, according to the decision of the County Court, required by the public interest, and the net profits of which, if they have made any such profits, are held by them in trust for the very party now claiming damages, as well as those profits.

But, on the return of the cause to the Court below, the Circuit Judge should ascertain whether the trustees have made any profits by the keeping of their ferry, from the commencement thereof to the time of the inquisition; and if, after deducting all incidental costs and expenses, which had been prudently and in good faith incurred, any balance shall be ascertained to have come to their hands, they should be directed to pay it to the heirs of Samuel Kennedy.

Those heirs are entitled, also, either to a decree for a surrender to themselves, of the keeping of the ferry, upon executing a sufficient bond for indemnifying the

Spring Term
1839.

Kennedy's Heirs
vs
Covington.

A ferry on the Ohio was granted to the trustees of Covington, when the exclusive right to the profits of ferries at that point, had been reserved, & had passed to T. Kennedy, and his successors—who had a ferry in operation there.—But, as it is presumed, that the trustees acted in good faith in procuring and using the grant, & cannot be deemed guilty of tortious conduct, in acting under a decision of the coun ty court, that the public convenience required an other ferry, & as Kennedy's heirs are entitled to the profits of it—it is held that the trus tees should not be subjected to damages for the injury resulting to the heirs, from the competition between the two ferries. But— The net profits re ceived by the trus tees, from their ferry, are to be ascertained, and decreed to the heirs—as cestui que use. And—

The heirs being entitled to the profits of all the ferries at that place, may, at their election, either receive a surrender of that granted to the trustees, upon paying them (out of the profits) for their boats &c. and binding themselves, with security, to keep the ferry according to law, and indemnify the trustees against liability on their bond; or, they may permit the trustees to continue their ferry, upon their giving bond to keep it properly, charge the maximum rates of ferriage, and account to the heirs for the clear income which may be derived from the ferry.

Spring Term
1839.

Kennedy's Heirs
vs
Covington.

trustees against their own liability upon their obligation as the grantees and legal proprietors; also, to keep the ferry, according to law, as long as required by the County Court to do so; or to a decree requiring approved security for the net annual profits which may hereafter be made by the trustees, if they shall still continue to be the keepers of the ferry, and insuring fidelity to their equitable interests.

The heirs are entitled to the full benefit of the entire ferry franchise at Covington, and should be secured in the profits which it can be reasonably made to yield, consistently with the public interest. But the most effectual mode of attaining this end may be the subject of no little perplexity.

As the heirs of Kennedy are equitably entitled to the entire franchise—which is one and indivisible—one ferry grant might be sufficient; and the grantee or the beneficiary could be required to keep as many boats and other facilities as public convenience should require. And therefore, if private right or interest were alone concerned, we should enjoin the use of the ferry granted to the trustees.

But the public interest is the first and paramount consideration in the granting and regulating of ferries. And the reservation of all ferry privileges by the proprietors of Covington, should be understood as having been made subject to the public right to grant a ferry to the trustees, as the holders of the legal title for the benefit of the proprietors, if the public convenience or public justice should require such additional grant. The keeping up of this new ferry may, perhaps, be useful to the public; and therefore we will not enjoin the use of it according to the terms and public objects of the grant.

If the trustees continue to keep it, they may so keep it as to diminish the profits, unnecessarily, or unjustly, to the beneficiaries; and thereby, impair and possibly destroy the value of the whole ferry franchise at Covington. And whilst it shall be kept by the trustees, nothing we could prescribe would afford to the heirs of Kennedy, absolute security against injustice.

We have, therefore, determined that they should have the election, either to keep the ferry themselves, upon giving such a bond as we have before suggested, and accounting to the trustees for their boat, out of profits hitherto made or hereafter to be made by it; or to require of the trustees, if they be permitted still to keep the ferry, a bond with approved security, binding them to keep it in good faith and to exact in every instance, the *maximum* prescribed tolls, so as to make the ferry as productive as reasonably it may be, consistently with the authority and objects of the grant; and also, to pay over to Kennedy's heirs the annual net profits, which shall accrue from the ferry thus kept; and, in all respects, to act as trustees, towards Kennedy's heirs, as beneficiaries, in perfect good faith.

Wherefore, the decree of the Circuit Court is reversed, and the cause remanded, for such further proceedings and decree, as shall be proper, according to the principles of the foregoing opinion.