**436**

HISTORIC LICKING RIVERSIDE CIVIC
ASSOCIATION and Patrick M. Flan-
nery and James H. Allen, On behalf of
themselves and for the use and benefit
of all other taxpayers of the City of
Covington, Kentucky, Appellants,

v.

The CITY OF COVINGTON, Kentucky, a
Municipal Corporation and Kenton
County and Municipal Planning and
Zoning Commission and Mike Fink,
Inc. and Benson's, Inc., Appellees.

No. 88–SC–862–TG.

Supreme Court of Kentucky.

June 8, 1989.

Rehearing Denied Sept. 7, 1989.

Edwin F. Kagin, Covington, for appel-
lants.

Joseph T. Condit, Rita Ferguson, Coving-
ton, for appellee, City of Covington.

Frank Gofton Ware, Florence, for appel-
lee, Planning Com'n.

Robert E. Sanders, John Marshall Dosk-
er, Covington, for appellee, Mike Fink and
Bensons.

LEIBSON, Justice.

"On the 8th of February, 1815, the town
of Covington was established on a hun-
dred and fifty acres of land, on the rivers
Ohio and Licking, below their confluence,
by an act of the Kentucky Legislature,
reciting that Thomas D. Carneal, Richard
M. Gano and John S. Gano, the proprie-
tors of the town, and on whose applica-
tion the act was passed, had bought the
land from Thomas Kennedy, and vesting
the title in five persons as trustees, with
power to sell the *lots, as previously laid
off,* and to convey the titles, upon the
orders and for the benefit of the proprie-
tors. [Emphasis Original.]

On the plat of the town, as recorded in
August, 1815, there is an endorsement
signed by the proprietors and three of
the trustees, in these words:—

'Such part of the town as lies between
the lots and the edge of the bank of
the Ohio river, as will appear by a
reference to the said plat, shall *remain
for the use and benefit of said town,
for a common.* The proprietors re-
serve to themselves, their heirs and
assigns forever, all ferry right, and
advantage and privilege thereto, which
they have not disposed of, or which by
law they would be entitled to.' " [Em-
phasis Added.]

This quote from *Kennedy's Heirs v. The
Trustees of Covington,* 38 Ky. (8 Dana) 50
(1839), provides the historical background
for the present controversy. The present

plaintiffs are the Historic Licking Riverside Civic Association ("HLRCA"), an unincorporated association of residents and property owners living in Covington's Licking–Riverside neighborhood ("the lots, as previously laid off" referred to on the 1815 plat), and two named individuals, Flannery and Allen, property owners in this area.

The principal defendant is the City of Covington, which has recently enacted two ordinances rezoning a substantial portion of the riverfront designated as a "common" on the 1815 plat as referred to above. One ordinance, enacted 9/15/87, rezones approximately 55 acres of riverfront from Greenup Street (extended) west to the Clay Wade Bailey Bridge from "Conservation" ("CO") to "Riverfront Commercial" ("RCO"). The second ordinance, enacted 11/10/87, rezones approximately 18 acres of riverfront just east and adjacent to the 55 acre tract, beginning in the west line of Greenup Street (extended) and extending east to Kennedy Street (extended) from "Conservation" ("CO"), to a new classification designated "Limited Riverfront Commercial" ("LRCO"). These zoning changes were enacted to accommodate plans for substantial changes in the use of the area involved which will consist, in general, of leasing the riverfront to private persons and organizations for commercial development.

One commercial development has already occurred. In 1967 the City began leasing a portion of the river bank for use by a riverboat restaurant. This enterprise was bought out by Mike Fink, Inc., which then entered a lease commencing December 15, 1977, with a 1992 expiration date. Mike Fink's lease covers the riverfront from the west line of Greenup Street 1,300 feet East to the West line of Shelby Street, as extended, and from Front Street (a/k/a Riverside) to the water's edge, approximately 175 feet in depth. A portion of this leased property is now covered by Mike Fink's parking lot, privately maintained. Mike Fink, Inc. has intervened as a party in this law suit, and is an additional appellee.

Two suits were filed, each one thirty days following the rezoning ordinances and pertaining to the particular tract which was rezoned, the first to the 55 acres to the west of Greenup Street and the second to the 18 acres adjoining on the east. The suits were consolidated. They challenge the right and authority of the City of Covington to (a) enter leases to conduct private businesses on the land platted as a "common" ground, and (b) to enact zoning ordinances rezoning the tracts of land from "Conservation (CO)" to "Riverfront Commercial (RCO)" and "Limited Riverfront Commercial (LRCO)."

The suits demand that the rezoning ordinances be declared invalid, that the City be enjoined from engaging in any conduct (e.g., leasing, contracting, issuing building permits, etc.), pursuant to the ordinances, and that the City be enjoined from taking any action "which conflicts with or prevents the use of the subject property as a common." In the second suit which involves the area of riverfront leased to Mike Fink, the claimants also demand that any existing contract, lease or agreement which prevents "the public access or use of the common be declared invalid."

When we analyze these lawsuits the challenge to the rezoning ordinances is absorbed in and by the question posed as to the restrictive language in the 1815 plat dedicating the land involved as a "common." With the enactment of the 1980 "Home Rule" statute, codified in KRS 82.-081–.082, "A city may exercise any power and perform any function within its boundaries, ... that is in furtherance of a public purpose of the city and not in conflict with a constitutional provision or statute." KRS 82.082(1). It now has the "capacity," *inter alia,* "to acquire and dispose of property" which certainly includes the power to lease it. KRS 82.081. No longer does the City need special statutory authorization to act, unless, of course, to do so is in conflict with a statute mandating otherwise, so long as such lease is consistent with a "public purpose." Contrast discussion in *Bateman v. City of Covington,* 90 Ky. 390, 14 S.W. 361 (1890), with *Inland Waterways Co. v. City of Louisville,* 227 Ky. 376, 13 S.W.2d 283 (1929).

In the present case the trial court upheld the City's right to rezone for commercial leasing to private businesses as consistent with a "public purpose." We agree. Putting aside the issues raised by the restriction in the dedication, the Home Rule statute grants the City of Covington the same power as the City of Louisville enjoyed by special statutory authorization in *Inland Waterways Co. v. City of Louisville, supra,* wherein, because of special statutory authorization, we approved the City's lease of riverfront property to a private corporation for development as river terminals.

The appellants have raised "substantial evidence" and "due process" challenges to the rezoning procedure, but these arguments lack merit. *If first* we can disregard the restriction in the original 1815 dedication, there was ample evidence and legislative findings in the rezoning ordinances proceedings to support Covington's zoning map amendments, including rezoning to the newly enacted LRCO classification against the recommendation of the Kenton County and Municipal Planning and Zoning Commission. The appellants' cite of *City of Beechwood Village v. Council of and City of St. Matthews,* Ky.App., 574 S.W.2d 322 (1978), which rejects legislative findings that merely parrot statutory requirements in KRS 100.213 necessary for a proposed zoning map amendment, but the present facts do not fit this description.

The fundamental question underlying this case which, when answered, supersedes the otherwise legitimate changes in use contemplated by the new zoning ordinances, is the existence and nature of the land use restrictions in the original dedication in the 1815 plat. The dedication states:

"Such part of the Town as lies between the lots and the edge of the bank of the River Ohio as will appear by a reference to said plat shall remain for the use and benefit of said Town for a common."

The Findings of Fact, Conclusions of Law and Final Judgment of the trial court reduced the impact of this restrictive language beyond the vanishing point. The meaning given the phrase "use and benefit of said Town for a common," is destroyed by the trial court's findings that public access to the "common" can be limited to extinction, and that the land in whole as well as in part may be leased "all to third parties." The Judgment of the trial court approves any use of the land that "will promote the general economic well-being" of the community, without regard to a public right of access. In short, the trial court's conclusion is that this riverfront property, regardless of language in the plat to the contrary, may be used for any "public purpose" that the City deems appropriate, that the City may proceed with economic redevelopment of this property to the same extent and in the same manner that it could proceed if the property were owned by the City without restriction.

This appeal was taken from the trial court's Judgment, and, at the City's request, we granted transfer of the appeal to our Court. We disagree with the trial court's interpretation of the dedication, and reverse.

Before undertaking to state our opinion, first we take note that a substantial portion of this controversy has been mooted because appellants stipulated, both in their Brief and at oral argument, that they have no objection to a ruling allowing "the proposed development west of the Suspension Bridge to proceed." The Suspension Bridge transects the riverfront at a point west of Greenup Street. The appellants state "that area of the commons (west of the Bridge) is already inaccessible by the public due to the longtime presence of a floodwall" and their interests "would be adequately served if the City and the Mike Fink are confined to developing their projects exclusively west of the Suspension Bridge." These statements constitute an abandonment of their claims, and of this appeal, with regard to the area in question. We take this as conceding that as to this area, public use as a common has been legitimately extinguished, and proceed from there. As to this area, the Judgment of the trial court is affirmed.

Now we turn to the remainder of the riverfront which is still in question.

This case is unusual in that two prior cases deal directly with property rights in the same piece of ground. Unfortunately, in neither case is the issue squarely in point.

The first case, *Kennedy's Heirs v. Covington, supra,* quoted at the outset of this Opinion to provide historical background, involved the last sentence in the endorsement on the plat which specified, "[t]he proprietors reserve to themselves, their heirs and assigns forever, all ferry right, and advantage and privilege thereto, which they have not disposed of." Kennedy sold the land to the three "proprietors" who then conveyed it to the City Trustees when the town was established in 1815. Kennedy retained a mortgage against some of the lots and the ferry privileges, as "collateral security." The court held that Kennedy's heirs could not enjoin the City's right to operate a ferry from Covington to Cincinnati because the City had "acquired the exclusive legal title to all the land included within the chartered limits of Covington." *Id.* at 58. Nevertheless, based on Kennedy's mortgage and the ferry rights of the proprietors "recognized by the endorsement of the plat" protecting those rights, Kennedy's heirs retained a beneficial or equitable interest in the profits from any ferry franchise operated from the riverfront at Covington. The rationale of this case was that the grant of a franchise to operate a ferry from the river bank was an incident of the City's ownership of the property, but this did not extinguish equitable rights retained in the deed. Key language, binding precedent in the present case, is:

"The chief, perhaps the only, public motive for making the Ohio river the northern boundary of the town, was, as we are allowed to presume, not to secure to those who should purchase lots the profits of ferries across that river, but only to afford to them, at all times and under all circumstances, *an unobstructed access* to it, and an undisturbed right to the *common use* of its banks." *Id.* at 61.

In dealing with the nature of the public ownership of the "common," which is the property in question, the opinion states:

"[T]he trustees ... had no power to sell and convey the legal title, either to the common, or to the ground between that and the river: first—because the act establishing the town and defining the duties and powers of the trustees, gives them authority to sell and convey only the town lots, as designated on the plat of the town; and the plat shows indisputably, that the belt of ground between the Ohio and the parallel street nearest thereto, was not designed for town lots, but *was reserved for some other use;* and, secondly—because, ... in so much of the ground as lies between the common and the river, ... *exclusive use ... or dominion over it, as private property,* would be inconsistent with the ends for which it was set apart by the plat and the act of 1815[.]" [Emphasis added.] *Id.* at 58–59.

The Opinion goes on:

"[W]e must presume that the legal title to it was deposited with the trustees, not for alienation, but only for the purpose of holding it, and thereby effectuating the trusts for which it was dedicated, as obviously and inviolably, as the streets, alleys and common." *Id.* at 59.

*Kennedy's Heirs* establishes the City's "legal title" to the riverfront property in question, the public's right of "unobstructed access" to it, and the fact that the property was "dedicated" "not for alienation" but for a "common." Whether the City's ownership is as formerly, by trustees, or as presently, corporate, this public right of "unobstructed access" is not satisfied by giving the City power to enter private leases to the exclusion of the general public. Such interpretation would destroy the concept of retained rights expressed "inviolably" in the dedication in the plat.

On the one hand the appellees cite *Kennedy Heirs* for the proposition that the intended use of this "common" ground was commercial, not parklike or recreational.

Assuming the primary purpose was commercial, this fact would not destroy its character as a "common." In 1815 the river was a highway of commerce, and an inducement both to locate a city and to draw property owners to buy the lots platted south of Front Street. This "common" would provide and insure common access to the general public to the river highway. But its value to the public was never solely commercial, nor was the dedication so restricted. Commercial use and value to the public of the "common" ground would and did change over time, but this is not enough to destroy its value or character as a "common" ground. Much more so than a city street or city square, the riverfront is unique property. Its recreational and aesthetic value to the general public remains even if its commercial value disappears. The citizens of Covington in general, and in particular the landowners in the Historic Licking Riverside community, who are the successors in ownership to the lots for which the "common" was an inducement to purchase, have always enjoyed some benefit, derived some value, which is not just commercial from this dedication of land for a common use. To borrow an archaic phrase from the trial court's Judgment, it is an "incorporeal hereditament," held by the public at large. The City cannot, simply by abandoning its maintenance, vacate, abandon, or otherwise terminate its use.

We turn now to some basic premises from Powell on Real Property, Vol. 6A, § 926, "Dedication":

"Dedication is the term applied to a transfer of the ownership of land or of a privilege to use it to the public for a public purpose." *Id.* at 84–80.

. . . .

"The statement of purpose in the original dedication operates to fix an outer limit on changes in use." *Id.* at 84–104.

"[T]he courts have liberally invoked the concept of *cy pres* to expand an original dedication. Nevertheless, there are limits on these enlargements or alterations of use." *Id.* at 84–105–06.

The municipality is "under a duty to make proper and conforming use of the dedicated property for as long as such designated use continues to serve the public interest." *Id.* at 84–107.

To assist us in deciding the meaning of the term "common" as it appears in the dedication on the Covington plat, we have a precedent with a substantially identical factual predicate: *City of Newport v. Taylor's Ex'rs.*, 55 Ky. (16 B.Mon.) 699, 807, (1855). This case expounds at length (110 pages) on the establishment of the City of Newport on 1,500 acres on the opposite bank of the Licking at its junction with the Ohio, utilizing a plat very similar to that used to establish Covington a few years later. Once again the plat used the words, "a common," to designate "the space between the . . . lots and the river." 55 Ky. at 768. The City fathers maintained, with success, that "there was a dedication of that space to the public uses of the town, and to all the uses appropriate to such a space." *Id.* at 774–75. The court stated that the word "common" was "to be understood . . . in its popular sense, 'as a piece of ground left open for common and public use, for the convenience and accommodation of the inhabitants of the town.'" *Id.* at 806. The court held, p. 807:

"[T]he dedication of the slip of ground in question, as a common, by the plat of 1795, and by the act establishing the town, was a dedication of it as public ground, for the convenience and accommodation of the town and the public, and for such appropriate uses, exclusive of the ferry right in Taylor, and not inconsistent with it, as are to be implied in the dedication of a narrow slip open ground between the lots and a navigable river[.]"

Applying this definition, and the general principles regarding a dedication stated in Powell, *supra*, to the present case, neither the appellants nor appellees have stated a position that is wholly sustainable. The appellants have argued that the "common" must be maintained by the City for public use as parklike or recreational property. Although the riverfront would always have some benefit to the public as such, it is clear that commerce rather than recreation

was originally its primary purpose. On the other hand, the appellees have maintained there is no obligation to maintain a general right of public access to the property, that it may be privately leased in whole or in part, which squarely conflicts with its original dedication as common ground. This riverfront property, originally and continuously, has had value for use by the public at large, as promised by the original dedication as a "common." Therefore, as stated in Powell, *supra*, at p. 84–107–08, "[m]isuse ... or diversion whether partial or complete, does not usually constitute abandonment."

We turn now to the second case involving the same piece of riverfront property presently at issue, *Bateman v. City of Covington*, 90 Ky. 390, 14 S.W. 361 (1890), cited *supra*. At oral argument, the appellants quote extensively from the Brief filed in *Bateman* on behalf of the City of Covington. The appellants pointed out that in *Bateman* the City fathers used the same restriction on use to a "common" provided in the plat, which they now denigrate, to argue against the validity of a five-year lease from the City to Bateman of a portion of its wharf lying within the "common" area. Nevertheless, *Bateman* was not decided on the restriction in the plat, but on general principles regarding limitations on municipal power absent special statutory authority:

> "When a city undertakes to confer on a private individual such a right in streets or wharfs, without legislative authority, as will produce a conflict between the public and the private use, the act is *ultra vires* [.]" *Id.* 14 S.W. at 362.

*Bateman* did not reach the further question of restraint on the City's right to enter a private lease by reason of the dedication. It spoke to the general issue of lack of municipal power or authority to act absent special statutory authorization. As previously noted, the advent of home rule has vitiated this argument. Now, a "city may exercise any power and perform any function within its boundaries ... that is in furtherance of a public purpose of the city and not in conflict with a constitutional provision or statute." KRS 82.082(1). The appellants have failed to point out any constitutional provision, statute, or "comprehensive scheme of legislation on the same general subject" which would be transgressed by the lease to Mike Fink, Inc., or other uses of the property presently contemplated by the City of Covington. Nevertheless, while the *Bateman* case is no longer applicable, the arguments on behalf of the City in *Bateman* lend credence to the proposition that the general right of public access was the intended use of this riverfront property.

Dedication of land to public use is not confined to usages known at the time of dedication. It includes the right of the public to use the property in other ways "convenient and comfortable, according to changed conditions." *City of Hazard v. Eversole*, 313 Ky. 254, 230 S.W.2d 921, 924 (1950). The trial judge cited *Eversole* as authority for the City's right to enter into private leasing. In fact, the case stands for the principle that since the right described was that of common access, the dedication was not abandoned and destroyed by a changed mode consistent with the times.

Appellees cite *Kentucky Lake Vacation Land, Inc. v. State Property and Bldgs. Comm'n.*, Ky., 333 S.W.2d 779, 783 (1960), as authority that "charges may be made for the use of certain facilities at state parks." But in the *Kentucky Lake Vacation Land* case the court was careful to retain the concept that the facilities must be "made available to the general public." *Id.*

We conclude that the dedication of this property as a "common" means that its use may be changed, but its dedication may not be abandoned unless "impossible of execution." 23 AmJur 2d, Dedication, § 67, p. 57. The City may charge the general public fees for use of various facilities provided on the riverfront, but it may not enter private leases that exclude the public from any substantial portion of the "common." The "withdrawal of comparatively small areas of the surface of the Common from public use" is consistent with the dedica-

tion, as permitted in the *Boston Common* case for access to an underground parking garage (see *Lowell v. City of Boston*, 322 Mass. 709, 79 N.E.2d 713, 731 (1948)). Thus we see nothing inconsistent with the principles of law involved in providing wharf space and entry space for Mike Fink's riverboat restaurant. But it is inconsistent to lease a substantial portion of the riverfront for a private parking lot from which the public may be excluded at the instance of the lessee. Dedication as "common" ground assures public access to parking facilities.

We do not by this Opinion intend to restrict the City of Covington from any plans for development of its riverfront except those which impair the right of public access to any substantial portion thereof. To the extent that privately leased or franchised commercial enterprises may be maintained that do not significantly and substantially impair the right of public access provided by the dedication as a "common," the City is free to proceed with private development adjacent thereto, even though such may involve limited and insubstantial private use of "common" land.

The appellees have argued that the precise wording in the dedication, that the land "shall remain for the use and benefit of said Town for a common," means that the "Town" may use the riverfront for any public purpose, including private development which provides economic benefits to the City. The word "Town" was used here in a general sense because it was the City Trustees who were vested with legal title. The words "for a common" specified the beneficial use and cannot be disregarded simply because the town fathers have now decided that a different use would be of greater economic benefit.

We have decided only that so much of the lease to Mike Fink, Inc., as permits the riverboat to tie-up to the shore and to a limited use of wharf space and entry space, is permissible, while so much of the lease which ties up a substantial portion of the riverfront for a private parking lot from which the public may be excluded is in violation of the dedication. Beyond that, we make no factual decisions as to plans for future development of the riverfront, except to order that use of "common" ground must be consistent with this Opinion.

The appellees have advanced further arguments against the appellants to the effect that relief should be denied for reasons of *res judicata*, waiver, latches and estoppel. These arguments are so insubstantial as not to merit extensive discussion in this Opinion. These appellants were not parties to an earlier suit involving in some respects the same general subject matter, which was dismissed with prejudice for failure to prosecute. Nor is there any specific or general statute of limitations transgressed by the present action. The appellee, Mike Fink, Inc., has no interest in the premises, valid or otherwise, beyond the expiration date of its present lease, which is 1992.

There was no evidence to prove undue delay as that term is used as a defense to enforcing an equitable right of this nature. As stated in response to a similar argument in *Trustees of Augusta v. Perkins*, 42 Ky. (3 B.Mon.) 437, 445 (1843):

> "[T]ime, unimportant how long, would [not] have ripened or matured this kind of control and occupancy, into a right to convert the property into private purposes, and to terminate and destroy the public use.... The long continued acquiescence of the Trustees and citizens of the town, can only be considered an acquiescence in the use, and not an acquiescence in any right to prevent and destroy the use."

The real question in this case is not whether a "common" exists or whether it insures a right of public access. That it exists is as plain as the word in the plat, and its meaning is as clear as the definition given to the term in the *City of Newport* case. The real question is how much can the City do with the land consistent with the right of public access. Certainly, it is not required to provide a "green space," or to build and maintain a public park. Just as certainly it cannot claim that the value of public access to the riverfront is worthless because it has not done so. The question is how much other use, i.e., economic development, can be made of the "com-

mon" consistent with the right of public access.

To paraphrase Chief Justice Stephens, this Court should not (and in this case it will not) rewrite or negate the "simple, precise intent of this document." *Bjorkman v. PECUSA*, Ky., 759 S.W.2d 583 (1988), Dissenting Opinion. Here the intent specified was to dedicate the riverfront for "use ... for a common," not to transfer the land unrestricted.

We remand this case to the trial court to enter judgment consistent with this Opinion.

COMBS, LAMBERT and VANCE, JJ., concur.

STEPHENS, C.J., dissents by separate opinion in which GANT, J., joins.

WINTERSHEIMER, J., not sitting.

STEPHENS, Chief Justice, dissenting.

I respectfully dissent.

As the majority opinion indicates, the critical question on this appeal is whether the two challenged zoning ordinances, and the *possible* use of the land under their aegis, violate the dedicatory language in the 1815 plat.

The majority states that the trial court's findings of fact and judgment have "reduced the impact of this restrictive language beyond the vanishing point." This is where I part company with the majority. It is not the trial court's decision that reduced the efficacy of the dedication, i.e., the use of the land as a "common." Rather, it is the evidence in the record before us, the only evidence we may consider, that not only defines the meaning of "common" as used in the plat, but also reflects changes in said definition over time.

Whatever the original meaning of the word "common" may now be determined to be, the evidence in this case shows that the proposed land use in the two contested zoning ordinances is consistent with the actual use of this riverfront property since 1815. On the basis of this evidence and the trial court's extensive and thorough discussion of it, I would hold that the proposed use of the land—as expressed in the two zoning ordinances is: (1) consistent with the intent of the donors of the land, and/or (2) is consistent with the actual original and continuous use of that land since 1815.

The grantors reserved to themselves the right to conduct a ferry boat operation on the land. This was a commercial activity, with public access. In the early and mid-1800's the land was used as a coal dock, which was also a commercial use, with public access. As Covington grew and developed, the land was used as a boat landing area, to which the public had access.

Part of the land was actually sold for the construction of a pier upon which a commercially operated toll bridge was built. The public had, and has, access to this bridge. For the past twenty years, the land has been leased to a privately owned, but publicly accessible restaurant. On a substantial part of the "common" area, a floodwall was constructed. This clearly restricted in a substantial manner the public access that the majority urges.

The present and the proposed uses of the land in question, while outwardly different because of the changing times, are the same in essence as the use of the land in 1815. Under Covington City Ordinances, Nos. 0–57–87 and 0–72–87, the property will be used for commercial and business purposes which reflect the commerce and business needs of the changing times.

The public has consistently had access to the commercial activities conducted on the "common." Moreover, the public will continue to have access to the businesses permitted under the two ordinances. I conclude that the use proposed is in the modern day nature of accessible riverside commercial activity contemplated by the donors of the land.

Additionally, if one does not agree with this thesis, and believes instead that the land should be totally reserved for noncommercial public use, the evidence described above, which only cursorily summarizes the extensive findings of fact by the trial court, indisputably shows that from the very beginning such a use has never been the actual practice. The land has been continuously used for business and commercial purposes. We have recognized

that the original purposes of dedicated land change with the times. In *City of Hazard v. Eversole*, 313 Ky. 254, 230 S.W.2d 921 (1950), we said,

"Dedication is not confined to the usages known at the time. It includes the right of the public to use the property in such a way as is convenient and comfortable, according to changed conditions ..." *Id.* at p. 924.

In the present case, the land has always been used for commercial purposes and not as a green area or park. By the very nature of such commercial activity, the use of the land by the public as a whole has been limited and restricted. For nearly 20 years the land has been used restrictively by a privately owned, public restaurant. But, the public has had access to the restaurant.

The proposed "change" in the land use is only an update of the historic, continuing use of the land for commercial and business purposes. Total public access to the land has always been restricted by its actual use—running livestock across the land to waiting barges; building a bridge on the land; shipping coal, and other products; and selling food and drink on the land. Appellants have failed to convince me that the general nature of the use of the land in question will change under the new zoning ordinances.

I find it a unnecessary and improper to remand this case to the circuit court. The use of the land under the ordinances, will be in principle and in practice, consistent with the use of the land for the past 174 years.

One further point remains. The majority states that a substantial portion of this lawsuit has been "mooted." The appellants, adjacent property owners, have conceded that any proposed development west of their property, beginning at the Suspension Bridge, may proceed with their permission. The appellants have conceded, and the majority agrees, that although the requirement of a "common" applies to all the land in question, that a violation of the restriction is proper on some of the land, albeit not on the land in front of their property.

I believe that if the restrictive language is efficacious, it is so as regards to all the land. I am unaware of any authority or precedent which would permit this Court to approve an illegal act. If the ordinances, and the use of the land thereunder, violate the dedication, we should hold that it is violative as to all the land. As a corollary to that premise, it can be argued that if the proposed use of the land is proper *west* of the Suspension Bridge, it is also proper *east* of that structure.

It is my belief that the concession of appellants with respect to part of the land should be made applicable to *all* of the land. In law, one should not pick and choose what is proper or what is improper, based solely on one's own personal interest.

I would affirm the judgement of the trial court.

GANT, J., joins this dissent.