ROWAN'S EX'RS.
    vs
TOWN OF PORT-
    LAND.

---

CHANCERY.

## Rowan's Ex'rs. *vs* The Town of Portland *et al.*

Case 62.

### ERROR TO THE LOUISVILLE CHANCERY COURT.

*Towns.   Dedications.   Public uses.   Limitations. Wharfage, &c.*

January 24.

CHIEF JUSTICE MARSHALL delivered the opinion of the Court.

Case stated.

GENERAL WILLIAM LYTLE being the proprietor of a tract of land on the Ohio river below and adjoining the present city of Louisville, obtained in 1812, the grant of a ferry from a part of said tract; and in the same year caused a town to be laid off on the adjacent land, of which, under the name of Portland, a map or plan was made under his authority, representing said town, with its streets, alleys, lots, and squares, situated on the bank of the river, and apparently extending to the water. On this plat or plan, water street is represent-

ed as of the width of 100 feet, running up and down the river through the whole extent of the town. Other streets of 99 feet in width, run parallel to water street, and at right angles to all of them, the cross streets of equal width, run from the interior, or back line of the town, through the space between water street and the river, and down to the water's edge; and a street of 50 feet in width running around the exterior limits of the town, also terminates above and below at the water. This plat or plan appears to have been deposited for record by the agent of Lytle, in the office of the clerk of the County Court of Jefferson, in April, 1812, where it was in fact recorded.

In 1814, Lytle invited bidders by a public notice, to attend a sale of lots in the town of Portland, to be held on the 2d day of May, in that year. In the notice of the sale, he represented the town as situated immediately on the bank of the river, and as surpassing other towns on the Ohio in point of trade and as a place of deposit. In a second notice or advertisement for the sale of lots in Portland, to be held on the 27th day of October, 1817, he represented it as situated on the Ohio river, about two miles below Louisville, &c., at the main harbor and anchorage below the Falls. And having in the mean time extended the plan of Portland so as to unite with Louisville and Shippingport, he commended it as likely to become in a few years a great and commercial city.

Prior to this second day of sale, Lytle had caused a second plat or plan of the town to be made, exhibiting the old or lower town as originally laid out, with the alteration presently to be noticed, and also the enlargement, or addition by which it was connected with Louisville. This second plan, with an endorsement on it signed and sealed by Lytle himself, importing that it was to be recorded in the office of the County Court of Jefferson, as and for the plan of the town of Portland, by which all past and future sales, &c. were to be regulated, was by him deposited and acknowledged for record in said office, on the 30th day of June, 1818, and was then recorded.

By the original plan of old, or lower Portland, the cross streets having been extended by lines from water street to the river, these lines, with the intervening line of water street and the river on the opposite side, bounded the spaces between that street and the river, and which were divided from each other by the cross streets. These spaces were not, however, divided like the squares on the other side of water street into smaller lots, but were left entirely free from any sub-division.

In the second plan, which exhibited the original town with the addition thereto, the cross streets were not extended by lines running from water street in the old town, or from front street, which was the name of the corresponding street in the now town, to the river; nor were water and front streets limited on the northern or river side, by a continuous and unbroken line, but by a line with breaks or intervals in it opposite and equal to the openings of the cross streets on the other side. By this last and authoritative plan, the space between water street and the river, which in the first plan had been apparently divided by the lines of the cross streets into open squares, each with a front on water street equal to the front of the opposite square, and each running down to the water, was, (with the exception hereafter to be noticed,) left entirely open, without division or discrimination by which the use or purpose, or proprietorship of one part might be distinguished from that of any other.

It appears that but few, not more than six or eight lots, were sold before the alteration and enlargement of the plan of Portland; a good many were sold at the public sale in October, 1817, and a still greater number by private sale about and after that time. It might be presumed that these sales were made by the map or plan of 1817, which was conclusively adopted by Lytle. His endorsement of June, 1818, shows that all sales were to be regulated by that map. So far as he then had title, he had a right to adopt any alteration made by that map to his disadvantage, if there was any such. But it is clearly proved that this map was hung up for public inspection at the time of the sale in October,

1817, and that it was often referred to for explanation, both by the vendor and the purchasers of lots, and that in fact the sales were made with reference to it.

This map, therefore, is to be assumed as the representation of the town in which the lots were sold; and not as a merely verbal, but as a written and recorded representation of its localities and divisions, its streets, alleys, thoroughfares, commons and public grounds, so far as they are indicated by it. In all these respects it is to be regarded as having entered into and formed a part of every contract for the sale of a lot in the town, by its number or position in the plan, and as having been adopted and confirmed by every conveyance of a lot described by similar reference. It is, in fact, identified with the town itself; and every reference to, or recognition of the town, is a recognition of the plan by which its various divisions and the localities and uses of its different parts are identified. It cannot be doubted that every purchaser of a lot according to the plan, acquired an interest in it not only as evidence of the position of his purchase, but as evidence also of the several advantages and privileges pertaining to the town and the lots, as indicated by the plan, and especially as evidence of the localities, divisions and uses of its various parts as therein presented. Nor can it be doubted that in purchasing and paying for his lot, he purchased and paid for, as appurtenant to it, every advantage, privilege and easement which the plan represents as belonging to it as a part, or to its owner as a citizen of the town, and that a conveyance of each lot with reference to the map, or merely as a part of the town, was a conveyance of all these appurtenances as ascertained by the map which is the basis of the town as such, and identified with it. These conveyances then, in connection with the map, to which they must be understood as referring, whether expressly or not, and the declaration endorsed by Lytle, that all sales were to be regulated by the map, operate as a conclusive grant or covenant securing to the purchasers and to the town, all advantages, privileges and easements appearing by the plan to be appurtenant to the lots or the town, and this without any other aid from

*The proprietor of a town having made and exhibited a plan thereof, and caused it to be posted up on the day of a public sale of lots, accompanied by a written declaration attached thereto, that sales, past and future, were to be regulated and governed by it, is bound, as well as the purchasers of lots, to be governed by such plan in respect to all the advantages and easements, as well as disadvantages arising out of the plan.*

parol testimony than is always and necessarily admissible in identifying the subjects and fixing the application of written instruments. The notoriety, actual as well as legal, of the acts involved in the making of a town, the laying out of the town upon the land, the representation of it upon a map open to public inspection, and in this case recorded in the office of public records; the advertisement and sale of lots according to that plan, the conveyance of them by recorded deeds referring to the plan, the subsequent enclosure and improvement of some of them for business or residence, and in fine, the actual existance of a town upon the land, must be considered as giving to the world such notice of the plan to which all of these acts and facts must have reference, as to preclude the possibility of afterwards acquiring from the original proprietor, or of asserting, with a good conscience, any right or interest inconsistent with those which, according to the plan of the town, are appurtenant to the lots, and are, therefore, granted to or held for the lot owners or citizens, and the local or general public.

The mere laying out of a town upon a man's own land, and by his own private act, and the making and recording of a plan of the town, may not, and as we suppose, do not of themselves, conclude him to any extent. The land, notwithstanding these acts, is still his own, and neither any other individual nor the public, have any right to interfere with such use of it as any man may lawfully make of his own. Though he has laid out a town upon the land and upon paper, he is not bound to sell the lots or to make or authorize the making of a town in fact. If he never disposes of a lot or lots, as part of the town, no one has any interest in the town as such, or any right growing out of his acts in relation to it. But in selling to others the lots laid off as parts of the town, he creates in them an interest in the town and its plan, which places both beyond his future control, (to their injury,) unless by the consent of the vendees, or by re-acquiring the lots which he had sold to them, before any other actual interest in the town had grown up. And as we suppose, that in the case of

a town thus established or made by the private acts of the proprietor, he might, by a re-purchase of all the lots before any actual use of the streets and other open places by the public, re-invest himself with the same rights and dominion which he had before any sale, it would seem to follow that the public at large does not acquire immediately from the proprietor, even by his act in selling and conveying the lots, any absolute or indefeasable right or interest in the existance or plan of the town, or in any of the advantages which it promises. But this right vesting at first in the purchasers of lots, and as appurtenant thereto, and subject to be defeated by their re-conveyance of the lots to the proprietor before the land is appropriated to any actual uses of a town, becomes consummated and indefeasible by such appropriation; and being thus perfect in the lot owners, results necessarily to all who, by residence, business or in any other manner, may have an interest in the town or in the use of all or any of its various parts and divisions, for the purposes to which, by its plan, they are to be or may be appropriated.

The right which, as we suppose, passes to the purchasers of lots as appurtenant thereto, is not the mere right or privilege that each purchaser may use the streets and other public places according to their appropriate purposes; but the right acquired by each purchaser, that all persons whatever, as their occasions may require or invite, may so use them; or, in other words, we suppose the sale and conveyance of lots in the town, and according to its plan, imply a grant or covenant to the purchasers, that the streets and other public places indicated as such upon the plan, shall be forever open to the use of the public, free from all claim or interferance of the proprietor inconsistant with that use. It is not necessary, therefore, to presume or imagine a grant to the public in order to ascertain the right of use in the public; nor is it necessary to assume that there may be a grant without a grantor, or to say that the title may remain in abeyance until there is a grantee capable of taking.

ROWAN'S EX'RS.
vs
TOWN OF PORT-
LAND.

The right acquired by a purchaser of a lot in an established town is not confined to the mere use of the ground purchased, but extends to the use of all the streets, alleys, public ground and other public rights in the town, according to their appropriate purposes.

ROWAN'S EX'RS.
vs
TOWN OF PORT-
LAND.

If the town of Portland had been established by public authority, the title to the entire tract covered by it would have passed by law to the trustees of the town, who would have held the lots for sale for the benefit of the proprietor, and would have held the streets and other public places in trust for the public, and subject to such uses, present and future, by the local and general public, as under the act of the proprietor, in moving the establishment of the town or of the public tribunal in ordering it, might be appropriate. In such case the designation by the proprietor of particular parts or spaces as intended for public use, would, though appearing on the map alone, be regarded as conclusive dedications of such parts or spaces to the uses designated, and the trustees would not only hold the title subject to these uses, but could not defeat or impair them.

*When a town is established by public authority, the streets, alleys and public grounds designated on the plan, vests in the trustees for the use of the property holders in the town, and cannot be diverted from that use. The same rule prevails where it is of private establishment.*

The fact that the town was not established by public authority, but by private acts of the proprietor of the land and the purchasers of lots, and the consequent fact that there were no public trustees to receive the title, although they left the title in the proprietor so far as it was not conveyed by him to the purchasers of lots, did not impair either his power to engraft upon it any trust or use which might be lawful, nor the obligatory effect of those acts which, as already shown, did, in fact, create a right of use in others and in the public, as to those parts of the town which, by the plat or plan, were designated for public use. He held the title, therefore, subject to this use and as a trustee, was as much bound to uphold and maintain it, as public trustees would have been, and had as little right to defeat or impair it as they would have had. And as the trust was open and notorious, identified with the origin and existance of the town, no grantee deriving the title from him, could hold it free from the trust, until by lapse of time operating upon an adverse claim and possession, the right to the use may have been barred.

*The right to the public streets, alleys and public grounds as designated by the*

We are satisfied, therefore, that whatever ground within the limits of the town of Portland, as presented by the plat and plan of said town, appears to have been designated as for public use, must be taken to have been

irrevocably dedicated to that use by the recorded plan and endorsement thereon, and by the recorded deeds conveying the lots according to said plan; and that the title of such ground remained in Lytle in trust for, and subject to such use, and if it passed to Rowan under his purchases and deeds from the Sheriff, in 1821, and from Lytle in 1822, and under the decretal sale and commissioners deed of 1830, it vested and remained in him, (except as he may have conveyed it,) under the same trust and for the same uses; and so passed by operation of law, to the first public trustees under the act of 1834, establishing the town of Portland, and in the same manner to the city of Louisville under the act of 1837, annexing Portland to the city, and again to the trustees of Portland under the act of 1842, separating that town from Louisville.

Then we come to the enquiry whether, upon the face of the map or plan of the town of Portland, the slip or space between water and front streets and the river, is designated as having been intended and appropriated for public use, and if so, whether there was or is any limitation as to the nature or extent of that use, or any reservation of individual interest or property in the proprietor. For reasons already sufficiently intimated, we regard this question thus presented in the present case, as standing substantially on the same footing and to be affected by the same consideration as if on Lytle's motion in the County Court of Jefferson county, that Court had established the town in 1817, and vested the title in public trustees according to the plan by which, in that year and afterwards, the lots were sold.

That the town extended to the Ohio river, leaving no space between the town and the water, is a position which, in our opinion, does not admit of question. There is no line dividing or separating the town from the river. And if there were, it should rather be presumed that the space between such line and the river, was thus discriminated for the purpose of showing that it was intended for some use of the town different from that of the ordinary streets and public grounds, (or that the cross streets at least, were intended to be extended

*Margin notes:*

ROWAN'S EX'RS.
vs.
TOWN OF PORTLAND.
————
plan of the town of Portland, recorded, became public property for public use, and vested in the trustees of the town when appointed, and are held in trust by them for public uses.

Was the space left between the water's edge and the street designated as front street, designated as having been intended for public use? And if so, was there any limitation as to that use or reservation of individual interest in the proprietor?

The plan of the town showing no line separating the town from the Ohio, the inference is clear that it was intended to go, and did go to the river: (2 J. J. Marshall, 224; 3 B. Monroe, 144; 7 Ib. 680.)

ROWAN'S EX'RS.
vs
TOWN OF PORT-
LAND.

to the river at some future day,) than that a town loca-
ted upon the bank of such a river, and at a point select-
ed for its commercial advantages, should be wholly shut
out from free and common access to the river.   The un-
reasonableness of this latter presumption has been more
than once declared by this Court, and the fact that a
town is laid off upon the bank of a navigable river, has
been held to be sufficient evidence of its extending to
the water, unless a contrary intention is manifestly in-
dicated.

In the case of *the City of Louisville* vs *Bank of the
United States*, (3 *B. Monroe*, 144,) this Court pronounc-
ing that Connelly, on whose patent the town was estab-
lished, owned the land to low water mark, decide that
the town as originally laid out and established, was
bounded by the same line.   And yet it is to be inferred
from what immediately follows, that there was an un-
broken line in the plan of the town on the side of water
street next to the river, and that the intervening space
was not divided into lots or squares; and the act of 1780,
for establishing the town of Louisville, (3 *Littell's Laws*,
540,) gives no further indication of the particular locali-
ty of the town, than that it is to be at the Falls of the
Ohio, on land said to belong to John Connelly.   But in
this case, as already shown, there is no line which can
be regarded as intimating any intention to separate the
town from the river.   The broken line on the north of
water street, shows that that street was not intended
to bind on the river.   But the intervals in it opposite to
the cross streets show affirmatively, and without resort-
ing to any presumption, that the town was not to be
shut out from the river.   And we say it extends to, and
is bounded by the river, not only because this is to be
presumed from its location on the bank, but because
there is no other northern boundary but the river.   A
location on the river has been held to be sufficient evi-
dence that the town so located, extends to the water,
in the cases of the *Trustees of Maysville* vs *Boone*, (2 *J.
J. Marshall*, 224;) *Giltner* vs *Trustees of Carrollton*, (7
*B. Monroe*, 680;) *City of Louisville* vs *Bank of United
States, supra*, and other cases.

If Portland had been established as a town by public authority in 1817, the slip of ground between water street and the river, would have been vested in the trustees. Would they have held it for the use of the town and the public, or as the private property of Lytle, to be appropriated to such uses as he might direct, or to be sold for his benefit to others, who might appropriate it as they should think fit? Or was it partly private and partly public property? As there were no trustees, Lytle stood in their place as to the latter, and held it for the same uses for which they would have held it. We confine ourselves in the consideration of the questions which have been stated, to the face of the map or plan of the town, and the inferences plainly deducible from it.

Rowan's ex'rs.
vs
Town of Port-
land.

Where a town is laid off by an individual into streets, alleys, &c. and sold out, the proprietor stands as trustee and holds the title for the property holders in trust for the appropriate public uses.

In the case of *the Town of Maysville* vs *Boone*, (2 *J. J. Marshall*, 224,) the Court say: "The front street runs parallel with, and near to the river. There were no lots between it and the river; but there is some vacant ground from this street to the margin of the river. This interjacent ground belongs to the trustees, never having been sold or otherwise appropriated by them." And from the subsequent parts of the opinion, it is evident that they were considered as holding it for the benefit of the town, and might obtain the grant of a ferry, of which the town should enjoy the profits. How the boundary of front street next to the river was designated in the plat, does not appear from the opinion.

In the case of *Giltner* vs *Trustees of Carrollton*, it is believed that the plat of the town showed a continuous line on the bank of the river. But the Court not only decided that the town extended to the river, but inferred that the space between said line and the river, (which was not divided into lots,) "was intended for public use as a common for the town, for affording free access to the river for lading and unlading boats."

In the case of *the City of Louisville* vs *Bank of the United States*, (3 *B. Monroe*, 144,) the Court infer "that although the cross streets did not appear to cross water street, yet such extension prospectively was considered a virtual and necessary consequence of locating the

The location of a town on a navigable river, is for the benefit of the river as a highway, and any space between the streets

Rowan's ex'rs.
vs
Town of Port-
land.
and the water's
edge, is presum-
edly dedicated to
the public as a
common for pub-
lic use: (6 Dana,
61; 3 B. Monroe,
144; 7 Ib. 680.)

town at such a point and in such a river, and that the interjacent slip was intended for public use." And in a subsequent part of the opinion, (page 157,) it is said: "It would be almost as reasonable to sell and appropriate as private property the river itself, as the ground lining its margin, the occlusion of which would obstruct the communication between the city and the river. The object of locating the town on the river, was to enjoy the benefit of its facilities as a highway." A similar inference of the intention "to secure at all times, and under all circumstances, a free access to the river, and an undisturbed right to the common use of its banks," is stated in *Kennedey's heirs* vs *Covington*, (8 *Dana*, 61,) to be deducible from the fact of making the Ohio river the northern boundary of the town. And it is believed that other cases in this Court have recognized the same principle.

It would be impossible to find in the present case, any circumstance appearing on the map of the town which should repel or weaken the inference which the cases above referred to authorize to be drawn from the location of the town of Portland on the Ohio river. On the contrary the intervals left in the northern boundary of water street in lower Portland, and front street in upper Portland, show conclusively that it was intended that there should be free access to the river, at least through those intervals. And although upon the original plan of lower Portland, it might have been a question whether the free access to the river was not intended to be restricted to the cross streets, the demarcation of which, upon that plan, divided the slip along the bank of the river into open squares; yet as there are no such division lines upon the new plan, and as the only conceivable purpose of omitting them in the new plan, (other than the inadmissible one of negativing all right of access to the river,) must have been to indicate that the entire slip was to be alike open in every part to this free access; and as, moreover, the new plan presenting the entire slip as one open space, without enclosure or division, affords no means of discriminating between those parts which were intended for public, and those, if any, which

were intended for merely private or individual use; and as the inference in favor of the right of public or common use to some extent, arises necessarily and conclusively, while the inference in favor of any reservation of private right is only conjectural, and is unsustained by any thing appearing on the map, and is repelled by the absence of any line or enclosure, or word indicating it; we are of opinion that the fair and necessary inference from the face of the map, is that the entire slip along the whole front of the town, (with the exception before referred to,) was left open for the public use, and was intended to be and remain a common or public ground, affording free access from all parts of the town to all parts of the river in front of it; and that this access was given, not merely for the use of the water for ordinary domestic purposes, but for the use of the river as a great highway of commerce, and for the enjoyment and security of all the advantages which the location of the town upon such a river, and at a point eligible for the anchoring or mooring of vessels, and for the deposit and landing or shipment of merchandize, was calculated to afford.

The only circumstances upon the map which are understood to be relied on as opposing this conclusion are: 1st. The broken line on the north of water street, and, 2d. The absence of any written words on the slip between that street and the river, indicating that it was dedicated to the public use. It is true if there were no line whatever between the squares on the south side of water street and the river, or if there being such line, the words "common or public ground," or other equivalent words, were inscribed upon the intervening space, there would be no plausible ground in reason or upon authority, to deny the dedication of the whole slip to public uses. But the broken parts of a straight line, unconnected with each other or with any other object and forming no enclosure, are not adapted to the purpose of separating private from public property, or private use from public use, and do not indicate such an intention. The openings in the line certainly give free access to every part of the space from the river to the street, even where it is defined by the line. And as

the line could not have been intended to indicate the unprofitable and vexatious right in the proprietor, to build a straight wall or fence along the northern side of water street, which, without enclosing any ground, would merely obstruct the direct access from that part of the street to the river, we conceive that the lines were intended merely to define the width of the street and not to present any obstruction, or right of obstruction, to the passage from any part of the street to the river. It might have been important to define the width of the street, not only because the use of the street might be different from that of the adjacent common, and the defining of the boundary between them, would prevent the encroachment of one use upon the other; but also because the duties of the lot owners on the south side of the street, might be very different, if it were only 100 feet wide, from what they would be if the street extended to the river. And although these objects might have been attained by stating the width of the street in words and figures, yet as the map was intended for the very purpose of presenting a plan of the town to the eye as a picture, we think no inference can be drawn from the fact that the map exhibits lines on the north side of water street, opposite and parallel to those on the south side, except that the space between them is a street, and as such, distinguished from the space beyond. The lines at last only finish out the representation of water street, and distinguish it from the adjacent space, but do not give character to the latter, except as not being a part of the street. The fact that the northern boundary of water street is not represented by a continuous but by a broken line, with intervals opposite to the cross streets, is understood to distinguish this case from that referred to in 3 *Blackford's Reports,* in which it was decided that a continuous line on the bank of a river, negatived the inference of a dedication of the intervening space to the public use of the town on the bank. The same fact also relieves this case from the effect of what was said in the case of *Barclay* vs *Howell's lessee,* (6 *Peters,*) indicating the opinion that the legal inference from a line on the side of water

street, next to the river, would have been that the inter-
vening space had not been dedicated to the public use.
We remark, however, that in this last case there was
no such line, and the question was not presented, nor as
we may presume, fully considered, whether the pre-
sumptions arising from the location of a town upon the
bank of a navigable river, of an intention to allow free
access to the river for the purposes of commerce, would
or would not outweigh the opposite inference arising
merely from the existance of such a line.   This intima-
tion of opinion as to a case not before the Court, is not
entitled to the weight of a judicial decision.   And as
has been shown, the current of decisions in this Court
is opposed both to this dictum and to the decision of the
Supreme Court of Indiana, in the case cited from Black-
ford.

. With regard to the absence of any written words in-
dicating the appropriation of the slip in question to pub-
lic uses, we remark that if such writing would have
added something to the certainty, it would have added
nothing to the authority of the dedication; that if the
dedication appears sufficiently upon the map, the record-
ing of the map and its endorsement, with the deeds of
Lytle referring to it, make it obligatory upon him and
those claiming under him; that under the considerations
which have been stated, the map does, in our opinion,
sufficiently and decisively indicate the public right of
free and unobstructed access to the river for all the pur-
poses of a commercial town, and that the entire slip be-
tween the street and the river, (with the exception
above referred to,) being left open to that access, the
inference arising from the absence of any more express
indication of the use to which the whole or any part of
it was to be appropriated, is against and not in favor of
the individual right.   We observe too, upon inspection
of the map, that the spaces which we take to be cross
streets, have, upon the plat of 1817, neither words nor
figures to indicate their character as streets, but we as-
sume with certainty that they are streets, because they
are spaces between the squares, crossing other similar
spaces named as streets, and because streets and cross

streets are necessary parts of a town having several tiers of squares. And so we may assume without any written words indicating the fact that the slip in question was intended and dedicated as a common for the public use, because it lies between the part of the town intended for habitation and business and the river, with which that business was to be connected, because free passage and use of the slip for access to the river for commercial purposes, was necessary to the town, and plainly intended to be given, and because although less than the whole might perhaps have answered these purposes, (as might be said also of the width of the cross streets,) there is nothing to indicate the reservation of any part and nothing to limit the right of public use or to restrict the dedication to any particular part or to any thing less than the whole. It was entirely within the power and at the discretion of the proprietor in the first instance, to determine how much or how little of this space should be open to the public use. Whatever was given or offered for that use by the indications of the map, was intended to operate, and doubtless did operate as an inducement to the purchase of lots, and as an enhancement of their price. The proprietor having thus presumeably obtained in the sale and price of the lots, the full consideration for whatever appears by the map to have been dedicated to the public use, and the purchasers having paid for and acquired for themselves and the public, the right to that use, there is every reason, in point of justice and propriety, for giving to the map such construction as shall secure to the town and the public, the promised uses to the full extent to which they appear by the map to have been promised.

We do not understand any of the cases as requiring that words shall be upon the map or plan of a town, expressing the objects and purposes of the different spaces and divisions appearing on its face, unless the case in 3d Blackford be regarded as going thus far. Such words as mere names could not operate as grants *per se*, but only as explanations of the map. Where from the position and relations of any open space upon the map, it might be doubtful for what use it was intended, or

whether it was to be public or private, a word designa-
ting its character would be useful, and might be neces-
sary.   But when, from the position and relations of any
open space in the town, it is apparent that it was intend-
ed to be public property, or for the public use, the dedi-
·cation of such space to the public, is as perfect as if the
name or purpose were indicated by a written word;
and after the sale of lots, made under such dedication,
it can neither be revoked nor limited in its extent, on
the ground of a supposed excess of the dedication, be-
yond the requirements of the public.   The proprietor
will have lost all power over the subject, and the only
power of the Court, is to ascertain and establish the
fact and extent of the dedication.

The foregoing principles are fully sustained by the
cases already referred to in this Court, and by the case
of *Buckner* vs *Trustees of Augusta*, (1 *A. K. Marshall,*
8;) *Augusta* vs *Perkins*, (3 *B. Monroe*, 437 ;) the town of
*Bowlinggreen* vs *Hobson*, (3 *B. Monroe*, 478;) *Cincinnati*
vs *White's lesseee*, (7 *Peters*, 431;) *Barclay* vs *Howell's
lessee*, (6 *Peters*, 000;) *New Orleans* vs *the United States,*
(10 *Peters*, 710;) *Livingston* vs *the Mayor of New York*,
(8 *Wendall*, 97;) *Lyman* vs *the Mayor of New York*,
(17 *Wendall*, 496;) *Trustees of Watertown* vs *Cowan*,
(4 *Paige*, 513;) *Hills* vs *Miller*, (3 *Paige*,260.)  To these
might be added many other cases, both in England and
America, tending to give efficacy to a sale according to
the plan or map of a town, as a dedication of the spa-
ces left apparently and appropriately open for the pub-
lic use, as streets, public squares, commons, landing pla-
ces, &c.   A reference to most of the cases, will be found
in the very elaborate and learned opinion of Chief Jus-
tice Cowan, in the case of *Pearsall* vs *Post*, (20 *Wen-
dall*, 116, *and seq.*)   And although the opinion and judg-
ment of the Court in that case denies that a public right
of landing and deposit for all the citizens of the State is
known to the law, or can be inferred from ancient and
adverse user, by all the citizens indiscriminately, and
although the learned Judge, evincing an evident disap-
probation of the extent to which the doctrine of dedi-
cation had been carried by the cases referred to, de-

ROWAN'S EX'RS.
vs
TOWN OF PORT-
LAND.

clares that he has "searched in vain in the English books
for the idea of a grant which can enure to the benefit
of all mankind," there is nothing in the case which can
disprove the public right asserted in the present case,
as being derived from the acts of the original proprie-
tor importing clearly a dedication to the use of the town
and the public. The efficacy of a dedication to public
use, arising from the clear indications of the map or
plan of a town by which lots have been sold and con-
veyed, is so well established by the adjudications of
the highest tribunals in our own and other countries,
and flows so directly from the principles of honesty and
good faith, which must be applied to the transactions
and the rights of individuals, and is so absolutely essen-
tial to preserve from oppression and outrage, privileges,
well understood, fully paid for, and necessary to the
reasonable enjoyment of that which is expressly grant-
ed, that it cannot be shaken by any metaphysical inqui-
ry into the capacity of the public at large to take the
benefit of such dedication as a grantee.

The right of the
public at large to
acquire ease-
ments over the
lands of individ-
uals, is not con-
fined to public
highways, but
extends to many
other easements
and uses: See
McConnell vs
Lexington, (12
Wheat. 522; Co.
Litt. 56, a.; 2
Brod. and Bing.
667; 5 Cowan's
Rep. 311; 8
Term Rep. 606.)

The argument of the learned Judge, would seem to
confine the right of the public at large to acquire ease-
ments over the lands of individuals to the case of a pub-
lic highway. But it appears from the references in his
opinion, that besides the numerous cases recognizing
and establishing the right of public use in streets and
commons, and public squares in towns, and in squares
dedicated to religious or charitable purposes; the reser-
vation of a spring of water for public use is recognized
in McConnell vs Lexington, (12 Wheaton, 522,) a cus-
tomary watering place in the inhabitants of Southwark,
is recognized in Coke Litt. 56, a., a grant of the right
of use of a landing place to the proprietors of a fishery
was held to be presumable, from twenty years use and
improvement and repair of the place for landing nets:
(2 Brod. and Bing., 667; 5 Cowan's Rep. 311;) and in
Botts vs Stennett, (8 Term Rep. 606,) a quay for the
landing of goods was likened to a way, and was held to
be pleadable in trespass as public and open. But as is
remarked, it was for a compensation to the owner. This
circumstance of compensation to the owner, appears to

have been wanting, or at least was not proved in the case in 20*th Wendall*, and the right, or presumption of a grant, was only sustained by the fact of continued user. The denial of the right in that case, is therefore no precedent for its denial in the present case. The owner was in this case compensated for the public right to the easement over the space in question, for all the uses appropriate to a commercial town upon a navigable river. The existence of the right does not rest upon the presumption of a grant arising from the fact of a user which might be equivocal or indefinite, but upon the plain and irrevocable acts of the owner, evidenced by his plan of the town, and by his sale and conveyance of lots, importing, as we conceive, a grant of all the easements, privileges and advantages indicated by the plan. In the very nature of the thing, the right of the public to use the streets and other open and public places of the town, according to their appropriate uses, and as the occasions of the public may require, is an essential and inseparable part of this grant. It would be absurd to suppose that this right was confined to the purchasers of lots, or the citizens of the town, when its essential value consists in its extension, to the general public, and when in fact, without the prospect of such extension, there would probably have been few or no sales, no citizens, no town. It was the prospective use by the general public, of the streets and public places, and easements pertaining to the town, that gave value to the lots and made them vendible, and the corresponding right of use must be regarded as having passed by the sale and conveyance of the lots. Whether the public at large was or could be the immediate grantee or recipient of this right, we should consider it fruitless to inquire. The potential right of use in and by the public, was created by the sale and conveyance of the lots. And whether it passed at once to the public, or remained in abeyance, or is the mere result of an estoppel, or vested in the purchasers of lots as a part of the estate conveyed to them, it was in either case, alike perfect and beyond the future control of the original proprietor

ROWAN'S EX'RS.
vs
TOWN OF PORT-
LAND.

Public ground
being dedicated
in a town to pub-
lic use, the right
is not lost for
want of use, but
exists to be used
as the public
convenience may
require; nor is
the use necessa-
ry to prove the
right.

or his alienees of the title on which this right of use was engrafted.

The dedication having been made and proved by the map and the sales and conveyance of the lots with reference to it, did not require a subsequent user to establish or prove it: (*Cincinnati* vs *White's lessee*, (6 *Peters;*) *Barclay* vs *Howell's lessee*, (6 *Peters;*) and we are not sure that it could have been defeated or lost by non-user even for twenty years, except so far as it was ousted by an adverse use for that period. To say that a dedication to the use of the future town and of the public, made when the site of the town was in a state of nature, would be lost if not followed by immediate and continued use, or should be limited to the extent to which it was thus used, would deprive the dedication of its practical and of its intended value, and would make it a mockery. As soon as there was in fact, a town with people, there was in fact, a public use of the slip now in question, and it has been continued, except so far as it has been shut out by individual appropriation, to the present time. Indeed, before there was an actual town, the public passed over any part of the land at pleasure in going to the ferry and the river, and this use has continued except as it has been restricted by enclosure and occupation of the ground. And although this use by the town and the general public, may not have sufficed to establish the right, at any rate to the extent of the entire slip in question, it is sufficient to preserve the pre-existing right from any presumption of abandonment or of ouster and loss by mere constructive possession or claim against it.

Parol testimony
competent to ex-
plain the extent
of a dedication,
of private prop-
erty to public
uses, made by a
platt of a town.

The two cases just referred to sanction the introduction of parol testimony not inconsistent with the map, to explain it and to establish the fact of dedication. In the last case especially, this testimony seems to have been regarded as the efficient proof of the dedication and the basis of its establishment. In the present case the dedication is established without resorting to the parol testimony of the declaration made by the proprietor and his auctioneer, at the time of selling the lots. This testimony is, therefore, to be regarded as corrobo-

rative only. With some few verbal discrepancies which might be expected in the detail of declarations made many years before, and probably made in different language at different times, or understood differently according to the peculiar notions or anticipations of different hearers, and with the exception of a very few witnesses who, if not now incompetent from interest, had certainly acquired an interest adverse to the public right, the general current of the evidence accords with the deductions which we have drawn from the map, and show that the slip in front of the town was intended and understood to be reserved or dedicated to public uses. It is, therefore, regarded as at once satisfactory and important. It is true the witnesses do not refer specially to the slip in front of upper Portland, as having been dedicated. But the statements of nearly all apply to the entire front of the town, and one or two only make any discrimination which could tend to except the slip in front of upper Portland from the dedication. We are under the impression from the record, that the witness or witnesses who make this discrimination, disclose an interest, real or supposed, in the exception. But be this as it may, as the dedication does not rest upon the parol testimony for its establishment, but upon the map, and sale and conveyance of the lots, it certainly cannot be limited by the inferences which one or two witnesses alone, out of many, may have drawn from the declarations accompanying the sale.

In the view which we have taken of the case, it is obviously unnecessary to enquire whether, if the map had been ambiguous and the dedication had rested solely on parol proof of declarations made at the sale of lots, it would have been so identified with the town as that all who knew of the existance of the town, must, in dealing with Lytle for any part of it within the dedication, be presumed to have had notice of it. We have already shown that the manner and evidence of the dedication were of such a character as to preclude the plea of want of notice. And although Rowan and other parties deny the dedication and deny notice of it, they do not and could not deny a knowledge of the map

The map of the
town plainly
showing a reser-
vation of a por-
tion of the land
on the river to
the proprietor, is
not to be consid-
ered as dedica-
ted to public use;
this is the case
as to square
No. 4.

and of the sales of lots which must affect them, with full notice of the dedication as made and evidenced by these acts.

Recurring then to the map, we may state here as the exception to the extent of the dedication, which though alluded to, has not been particularized because it did not affect the general reasoning or conclusion which we have adopted, that as appears by the map, the fractional square No. 4, at or near the junction of the first plan of Portland, and the subsequent enlargement, and which is in the enlargement, (that is in upper Portland,) extends to the water's edge. And this circumstance, as we apprehend, distinguishing this portion of the space next to the river from every other part, should be taken as sufficiently indicating the intention to reserve this square as private property, and as thus destroying the inference of its having been dedicated to the public use. It would seem from the evidence, however, that there is a continuous street or road on the bank of the river, from the lower to the upper extremity of the town. But whether it passes through or around this square No. 4, we do not ascertain from the evidence, and deem it unnecessary to determine; the position of the street and the right of way upon it not being now in question.

There being no indication upon the map of the reservation of any part of the entire slip as private property, except the square No. 4, the conclusion that the entire slip was dedicated to the public use, is subject to no other qualification. But it is contended that to whatever extent territorially, the slip may have been dedicated to the public use, there is and must be a limitation upon that use itself, and that the title having been retained by Lytle, and the public uses to which it was to be subject, not having been expressed upon the map or in the deeds, none should be raised by implication in favor of the town or the public, but such as are supported by an obvious necessity, and that all other rights and uses incident to the title, were of course, reserved as private rights to be exercised at the will of Lytle and his alienees, in and upon the slip which was the subject of the dedication.

This proposition, with the qualification that the necessity by which the extent of the public use is to be measured, is not to be understood in its most rigorous sense, but is to be construed with reference to the obvious purposes of the dedication, need not be controverted. These purposes as indicated by the presumed object of locating upon a navigable river, a town intended to be commercial, and by leaving open a slip fronting the town along the bank of the river, and convenient and proper for affording all the facilities of access which a commercial town might require, have been already stated, and as we think, fully demonstrated.

The practical question is, whether the right of wharfage or of charging tolls or duties for the landing and shipping of merchandize, and for the mooring of boats along the edge of this slip as claimed by the alienees of Lytle, was a right reserved from the dedication, or in other words whether it is or is not inconsistent with those rights and uses for which the slip must be understood to have been dedicated. Upon this question we have been referred to and have found but little direct authority, except so far as the cases already cited, establish the right of a free and unobstructed access to the river, and of the undisturbed common use of its banks for the purposes of commerce, and therefore, for the lading and unlading of goods. We understand, however, that this right of wharfage is, as its name imports, a riparian right, a right to charge for the use of the bank or shore of the river, and for such facilities as are furnished for this use, by the erection of wharves and other accommodations. The word key or quay, is defined to be "a wharf to land or ship goods or wares at;" and keyage "is the money or toll taken for lading or unlading wares at a key or wharf:" (*Tomlin's Law Dictionary.*) As the charge does not arise from the use or occupation of the water or river, which is free and open to all for the purposes of navigation and commerce, but from the use of the shore, in which there is a property in some person, natural or artificial, it would be immaterial to inquire whether Lytle was the owner of the land covered by the river on the side next to the town, or whether,

*Does the dedication of property upon the bank of a river imply the right in the public to charge and hold tolls for wharfage, &c., to the exclusion of all right in the proprietor? The dedication being of the use no right remained. in the giver or donor to erect wharfs or charge tolls or wharfage.*

if he were, the dedication of the land to the water's edge would not be carried *ad medium aquæ filum.* It may be that any one who is allowed to erect and retain possession of a wharf, would be entitled to charge toll for the use of it. And it may be, that the owner of the shore of a river may have the right to charge for the use of his land in lading or unlading goods, or for fastening a boat to a tree or stake on the shore, though there were no wharf at the place.

This latter right, so far as it exists, is the result of that full dominion which every one has over his own land, by which he is authorized to keep all others from coming upon it except upon his own terms. Unquestionably such a right in Lytle would have been directly inconsistent with that use of the shore for communication with the river which he certainly dedicated to the public. The exercise of such a right would be a manifest disadvantage to the town, and a palpable violation of the public right necessarily implied in the dedication. Then neither Lytle nor his alienees had, as owners of the soil and as against the town, a right to charge toll upon the commerce of the town or upon the access to and from the river. Had they the right then, at their own will and for their own profit, and independently of the permission of the town, to erect a wharf? This right, if it existed at all as an individual right, was exclusive and is claimed to be so. If Lytle, in virtue of his legal title and proprietorship, had the right at his own will and for his own profit, to make wharves and regulate the tolls, then the town had no such right. And conceding, as we do, that the making of a proper wharf, with reasonable tolls for its use, would not necessarily obstruct the public access to the river, and might be advantageous to the town as a place of commerce, it seems to us that this concession tends strongly to prove that this was one of the uses for which the slip was dedicated, and that it was not reserved nor understood to be reserved as an individual right in the proprietor. To say that the proprietor has this right, to be exercised at his own will, is to make him master of the commerce of the town, with power to withhold from it the facilities which

may be necessary for a successful competition with other towns, and for the full enjoyment of the advantages presented by its position, and actually held forth as inducements to the purchase of lots, or to grant them at such time, to such extent and on such terms as he might prescribe. Such a right is obviously inconsistent with the objects of the dedication, as necessarily implied from the circumstances already adverted to; and the proprietor after having received in the sale and price of the lots, full compensation for the facilities and advantages which the slip might afford to the commerce of the town, there could have been no tacit or implied reservation of a right in him to derive further profit from the use of the slip, for any of these purposes, or to limit or grant at pleasure the necessary facilities for its advantageous use. If this right had been expressly reserved in dedicating the slip, or if, instead of having been dedicated, the slip had been divided into lots and sold or reserved as private property, the town back of it, if under these circumstances there had been any, must have submitted to the consequent disadvantage. But as it was, in fact, dedicated to the public use for the commercial purposes of the town, the right to fit it for that use must also be considered as involved in the dedication as a part of it.

The cases cited from the Pennsylvania Reports, (1 *Yeates*, 167; 9 *Serg. and Rawle*, 26, *and* 3 *Watts*, 219,) if admitted to be evidence of the law in this State upon the subject to which they refer, do not, in our opinion, oppose the conclusion to which we have come with regard to this right of wharfage. Those cases relate to the rights of the owner of ground over which a public road or highway passes to a river, and decide that the owner of a ferry from the opposite side of the river, cannot land his passengers, &c. on the public road without or against the consent of the owner of the soil. And upon the ground that the landing of passengers, &c. on the public highway, was not within the purposes of the dedication. The amount of these cases as summed up by Chief Justice Cowan in *Pearsel* vs *Post*, (20 *Wendall*, 133,) is, "that roads are made to be trav-

*Argument showing how the interest of the town might be affected by the right remaining in the proprietor to make wharfs and charge wharfage.*

elled on, and not to be blocked up by sloops and scows."
But it would be directly within the purposes of the dedi-
cation in this case, that the entire slip in front of Port-
land should be lined with boats, and that every part of
it should be used for shipping and landing passengers
and freight. It was for these purposes, and not as a
mere road or common highway, that it was dedicated
to the public. And to the question, what right was re-
served, or what passed in the dedication, the well defined
rights of the public and the individual owner, in case
of a common highway, furnish no answer.

It is true, in the case in 1 *Yeates*, 167, (*Chambers* vs
*Fenny*,) the Court, after saying that the bed of the river
belonged to the Commonwealth, but the right of the ad-
joining land rests in the owner of the soil, goes on to
say: "Hence arises the right to wharves in the city of
Philadelphia and commercial ports;" and this principle,
which was however a mere *dictum* in the case, is refer-
red to in support of the private right now contended for.

But the admitted right of wharfing is no more inci-
dent to the ownership of the soil, than the right of
erecting a house or a wall upon it, or of using it in any
other manner, at the owner's pleasure. The principle,
therefore, has no application to the question whether
the right of wharfing, once incident to Lytle's owner-
ship of the soil, was or was not determined and passed
to the town or the public, by his dedication of the
ground to which it attached, unless indeed, the dedi-
cation should be understood as embracing and passing
the entire ownership, or all the uses of the soil, and
with it the incidental right of wharfing. Whether it
did in fact embrace the entire ownership or all possible
uses of the slip, we have not thought it necessary to de-
cide, because in our opinion it certainly did embrace
those uses to which the right of wharfing is essential,
and must therefore be considered as incidental.

We need not enter into any detailed illustration of
the disadvantages to which the town and the public
might be subjected, if the right of wharfing and of
charging toll upon the business of the town were vest-
ed in the discretion of a single individual, who might or

might not be a citizen of the town, whose interest might, in fact, be adverse to its prosperity, or who, whatever might be his interest, might, from want of means or of liberality or of judgment, fail to meet the necessities of the town and the public. There is a complaint on this subject in the present case, and a charge that tolls are exacted for wharfage without furnishing the proper or sufficient accommodations. But it is sufficient that the right does not exist as an individual right, that it can only be exercised for the benefit and in subservience to the interest of the town, that being essential to the beneficial enjoyment of the uses for which the ground was dedicated, it impliedly passed with the uses themselves, to be exercised by those whose right and duty it was to maintain the uses of the dedication, and that there being no circumstance to indicate that the town or the public was to be dependent for this facility of enjoying the intended uses, upon the will or interest or judgment of any individual, there is no presumption in favor of a reservation of the right as a private or individual right. Lytle or his alienee holding the title as trustee for the uses of the town and the public before the legal establishment of the town, and before there were any trustees to whom the legal title passed by operation of law, might doubtless have built or authorized the building of a wharf for the convenience of the citizens and of the public, or the citizens might have built or authorized the building of one. And the person or persons by whom the wharf was so built, might have been entitled to charge to an extent sufficient to secure a fair reimbursement and remuneration for their cost and trouble. We are by no means sure that the right of charging toll by the town itself, could be carried farther than this. But however this may be, we are satisfied that the individual right of wharfing and of charging wharfage upon the ground dedicated to the commercial uses of the town, could only exist by its permission or sufferance, or by act of the title holder acting as trustee for the town and the public; and that when the town was established by law, and the title of all the ground left open by dedication to public uses, passed to

Rowan's ex'rs.
vs
Town of Port-
LAND.
the public trustees, the entire right of wharfing and of wharfage, except so far as by adverse occupation of any portion of the slip, it may have been vested with the right in the soil in particular individuals, vested in the public trustees and became subject, like other matters of public right and interest pertaining to the town, to be exercised and regulated by them for the benefit of the town and of the public.

The appropriateness of such a lodgment of the right and power over the subject, is too obvious to require argument or illustration. And although it could not have been urged in support of the public right to the destruction of private rights plainly reserved in the dedication, it may and should operate as corroborative of the public right when claimed as a part of a dedication to the beneficial enjoyment of which it is essential, and which was made without any reservation of the private right, either express or implied. The ferry right, peculiar in its nature, not exercisable at the mere will of the owner of the soil, but grantable by public authority alone, and which had, in fact, been granted to Lytle, and was used by him for his individual profit, before and when the town was laid off and the lots sold, stands upon ground entirely different from the right of wharfage. Although attached to a portion of the slip which was dedicated, it was not essential to the public uses of the dedication. And according to the principles of this opinion, and of the case of *Kennedy's heirs* vs *Covington,* (8 *Dana,* 50,) it did not necessarily pass by implication, as a part of the dedication, but was impliedly reserved as the property of Lytle. His sale of the ferry right was, therefore, not inconsistent with the dedication, and his sale to the same person and at the same time, of the small portion of the slip including the ferry landing, may be accounted for by the supposition that it was deemed necessary to support the sale of the ferry. But whatever may have been the motive for making this and the two or three other sales made by him, they cannot, although inconsistent with the dedication, operate to disprove it, though they may, in connection with adverse possession, operate, *pro tanto*, to defeat it.

The right of the proprietor of a town to the use of a ferry landing in his use at the establishment of the town though within the space dedicated to public use, was not affected by such dedication, but remained private property: *Kennedy's heirs* vs *Covington,* (8 *Dana,* 50.)

It only remains then, to enquire how far any portions of the slip in question have been freed from the dedication to the public, and become private property by an adverse possession and claim of individual right for twenty years before this suit was brought. That the public right as growing out of the dedication in this case was subject to be divested and defeated by such possession, admits, as we think, of no doubt. The dedication was not to the use of the Commonwealth as a corporate being, and invested no title or interest in it. The maxim *nullum tempus occurrit regi*, is therefore, inapplicable. And there is nothing to exempt the right, which vested really in the town and its citizens, to be upheld by them for the public, from the operation of the statute of limitations, or from the presumptions arising from adverse claim and possession, as they would apply in ordinary cases of private right or public easements.

As we do not doubt that before the title was vested in the public trustees, the citizens of the town or any number of them for all, might have brought a suit at any time to establish the common right and repress encroachments upon it, making the title holder as trustee, and the individual wrongdoer claiming under him, parties to his bill, we are of opinion that as soon after the sale of the lots as a claim and possession adverse to the town, and derived from the trustee commenced, the statute of limitations, (by analogy,) and the presumption in favor of possession also commenced. But when the title to the open and public parts of the town vested in the public trustees, whose duty it was to maintain the public uses against encroachment, we are of opinion that the remedy for asserting the public right and relieving it from encroachments, vested absolutely and altogether in the public trustees, and that the individual citizens had no right of suit for the same purpose, except on the ground of a breach of trust and of duty in this respect, on the part of the trustees, which might make it necessary for private individuals, (*cestuis que trust*,) to sue in order to save the right. As this ground is not alledged in the bill of McGuire and Nicholas, who sue for themselves alone, we concur with the Chancellor

The right of the public in property dedicated to public uses, may be lost by an adversary possession for twenty years.

ROWAN'S EX'RS.
vs
TOWN OF PORT-
LAND.
in the opinion that the running of time upon the adverse possession established in the case, was not stopped by the filing of that bill, on which no relief could properly have been granted, but only by the assertion of right on the part of the trustees in their cross bill filed in the same suit. And as we perceive no error in his adjudication of the facts with regard to the extent and duration of the adverse possession proved to have existed in and over certain portions of the slip in front of lower Portland, we are of opinion that so much of the decree as declares and establishes the right of the public, and directs a surrender to the trustees of the possession of all of the slip between water street and the river in lower Portland, except the portions thereof between the river and water street, opposite to square No. 96, and to lots No. 1 and No. 4, in square 84, and to lot No. 12 in square 92, is correct. But we are of opinion that the Chancellor erred in refusing to declare and establish the public right as to the entire slip in front of upper Portland, with the exception of the portion designated on the plat as square No. 4, and the portion conveyed by Lytle to John T. and Philip Gray, by deed bearing date the 16th of August, 1821.

The square No. 4, having been excepted from the dedication, and the other portions of the slip having been freed from it by adverse possession of twenty years, under purchase and conveyance from the title holder, the right of wharfing and of wharfage as to these portions, is not in the town but in the individual owners in virtue of their ownership of the soil, and there was no error in not establishing the right as to these portions as a public right. Nor has the town, in our opinion, shown a right to have an account of the tolls or wharfage heretofore received by Rowan or others. It does not appear that the town has made the improvements or accommodations for which wharfage has been or might have been charged; and if it has been charged without any or without sufficient consideration, and has been, in fact, excessive, the town has no right to it on either of these grounds. It certainly has not been charged in the name or in right of the town, and whether claimed and re-

Where the original proprietor of a town built wharfs and charged wharfage on ground dedicated to public use in a town, the trustees of the town have no right to require a payment to them of such moneys.

ceived by mere usurpation or by the sufferance of the town, the wrong, if any, is rather against those who paid it, than upon the town, except so far as the charge may have been disadvantageous to its business. We suppose the dedication was made to the town for the purposes of commerce, to secure and advance its interest as a commercial place, and not with a particular view to any profit to be derived from wharfage. And as the town has suffered individuals to make the charge and the profit, and has incurred no expense for this particular object, we think the town must be content with the recovery of the right alone, without damages or an account.

Wherefore, the decree, so far as it relates to the cross streets in upper and lower Portland, and the slip in front of lower Portland, declaring the public right and denying the private right therein, and directing a surrender of possession, with the exceptions above mentioned, contained in said decree, and in dismissing the bill of McGuire and Nicholas, is affirmed upon the original and cross errors. But so much of said decree as denies the public right in and to the slip in front of upper Portland, is reversed, and the cause is remanded with directions to render a decree declaring and establishing the public right in and over said slip in front of upper Portland, with the exception of square No. 4, and the ground conveyed to the Grays in 1821, and directing a surrender to the trustees of Portland, of the possession of such parts thereof, (with the exceptions aforesaid,) as may be in the possession of any of the defendants, for the same purposes and in the same manner as is decreed in relation to the slip in front of lower Portland.

*Pirtle & Speed, Guthrie, H. Marshall and Thruston* for plaintiffs; *Loughborough and Duncan* for defendants.